THE PEOPLE *ex rel.* McLANE *v.* BOND, (ASSESSOR.)

The Act of May 1, 1851, authorizing "The Funding of the Floating Debt of the City of San Francisco," is substantially a trust-deed, whereby she agrees, on a valuable consideration, to place in the hands of certain trustees so much of her revenue and property, to be applied by the trustees to the redemption of her obligations, in the mode and according to the terms of her agreement.

The act being of this character, it was not competent for the Legislature to substantially change its terms, without the sanction of the creditors.

A creditor has a right to the substance of the contract as he has made it. It is his privilege to judge for himself whether it is for his interest for the agreement to be discharged in the particular way stipulated, or in a different mode; and neither the Courts nor the Legislature can change it in any substantial particular.

The city assessor and the city treasurer, by the act of 1851, are put in direct relations with the commissioners, and clear and definite duties are assigned to them, respectively, of a simple ministerial character. No one else is authorized to intervene between them, or to disturb their relations. Neither the old city government, nor the present city and county government—neither the mayor and council, nor the board of supervisors, have any authority to prevent the instant payment of this fund by the treasurer, in pursuance of law, to the commissioners.

There is nothing in the act of 1856—which simply alters the mode of levying taxes, the result not being changed—which, in substance, conflicts with the act of 1851 in those provisions which offered a security to the creditors for their debts. It is just as clear that the law does not contemplate the imposition of double taxation in any one year for the purpose of raising the money provided for by the act of 1851; and, therefore, the terms of the act of 1856, in this respect, supersede those provisions in the act of 1851 which declare the duty of the assessor to add to the list the several sums of money which are intended to be raised by the act of 1851.

APPEAL from the District Court of the Fourth Judicial District, County of San Francisco.

This was a *certiorari* issued out of the Fourth District Court to review the proceedings of appellant, as assessor for the city and county of San Francisco, in making up the assessment-roll for the current year. The appellant followed the provisions of the fourth section of the Act of 1851, (Statutes of 1851, 388,) entitled "An Act to authorize the Funding of the Floating Debt of the City of San Francisco, and to provide for the Payment of the same." On receiving a requisition from the board of commissioners provided by that act, the assessor added to the assessment-roll of the current year the sum of $145,242, for the payment of interest, and $50,000 for the sinking fund.

The Court below decreed the acts of the assessor, in adding to said tax-list the sum of $145,242, for the payment of the interest on said funded debt, illegal and void, and set the same aside. The defendant appealed to this Court. The other facts, sufficient to understand the points decided, appear in the opinion of the Court.

*F. P. Tracy* for Appellant.
The only question presented in this case is, whether the act of

1856, known as the Consolidation Act, (Statutes of 1856, § 71, p. 145,) repeals so much of the fourth section of the act of 1851, establishing the fund commissioners of San Francisco, (Statutes of 1851, 388,) as provides that the assessor shall, in completing the assessment-list, add to the amount which may be authorized by law to be raised thereon for other purposes, the amount certified by the commissioners, etc.

1. The statute of 1851 is a special statute, the object of which is, the payment of a specific debt, and provision is therein made for such payment. The mode of levying the tax is incidental to that statute, and general taxation is no part of the subject of the act.

The act of 1856 is general upon the subject of taxation in the city and county of San Francisco.

A subsequent general law will not be construed to repeal a prior special statute, unless the two are irreconcilable. The repeal of statutes, by implication, is not to be favored. Dobbins v. Board of Supervisors of Yuba County, 5 Cal., 414; Merrill v. Gorham, 6 Cal., 41.

2. The act of 1851 prescribes certain acts to be done by the assessor, after the general taxing officers have completed their work. He is to add to the whole amount which may be authorized to be raised by law for other purposes, the sum certified to him by the commissioners.

The act of 1856 only provides that the supervisors shall levy a certain amount of tax for all purposes.

It is submitted that this does not change the duties of the assessor who, under the act of 1851, was not to act until the other taxing officers had exhausted their powers.

How can an act, giving certain powers to and defining the duties of supervisors, repeal, by implication, an act which prescribes a duty to be done by an assessor after the supervisors have completed their action?

3. But it is said that the act of 1856 provides that the demand of the fund commissioners shall be paid out of the general fund raised by the tax which the supervisors are authorized to levy. Consolidation Act, Statutes of 1856, p. 172, § 95, subdivisions 5 and 10. And, therefore, a new provision being made for the payment of this act, the old fails, especially as the supervisors, (section seventy-one of that act,) are authorized to raise, by tax there limited, a sum sufficient to provide for the prompt payment of all demands upon the treasury authorized by that act.

The answer to this is, that, by the act of 1851, the demand of the fund commissioners is made payable, not out of the special tax added by the assessor, (§ 4,) but out of the general fund, and the first moneys in such fund received from all taxes. And, in 1851, the common council of San Francisco were only authorized, beside special school tax, etc., "to levy and collect—of city

taxes—on all taxable property, not to exceed one per cent a year on its assessed value." Stat. 1851, p. 360, § 13.

It would seem, then, that even in 1851, (Act to Reincorporate the City of San Francisco, Stat. 1851, p. 360, § 13,) there was a general provision, every way equivalent to that contained in the Consolidation Act of 1856, and which limited the per cent. of tax which the common council might levy for all purposes, without distinction, yet no one pretends that then the assessor was not to add the commissioners' tax.

4. The act of 1851 " entered into and became part of the contract" between the city of San Francisco and the bond-holders, " and can not be so altered or amended as to impair or destroy the rights of the parties, or the security which was the moving consideration between them."

So this Court held, in The People ex rel. Tallant et al. *v.* Woods, Treasurer, 7 Cal., 579.

But, when it is attempted to take away the very tax provided for the payment of the debt, and to throw the bond-holders upon a general tax which does not appear to be even sufficient to pay the ordinary expenses of the city and county government, this Court can not, without violence to its former decision, allow a special statute which makes part of a contract and vests rights in the bond-holders, to be repealed by a general law not necessarily in conflict with the special law.

Besides, the bond-holders accepted the law, and entered into the contract only on the express condition that the direction of their trustees, the commissioners, should be imperative on the assessor; and without their consent as contracting and interested parties, the Legislature can not make it discretionary with the supervisors to raise or not to raise by taxes a sum sufficient to meet the demand upon the assessor, and thus give the supervisors power to defeat the law. This would destroy all security which the bond-holders now have.

*Delos Lake and Gregory Yale* for Respondent.

The respondent contends that the provisions of the statute of 1851 are repealed by the Consolidation Act. Statutes of 1856, p. 145.

The seventy-first section of the latter act confers on the board of supervisors the power to levy and collect, in the mode prescribed by law for the assessment and collection of taxes, by tax each year, upon all taxable property, such amount as they may deem sufficient to provide for the prompt payment of all demands on the treasury, authorized by that act to be paid out of the same. Such taxes, however, exclusive of school tax, not to exceed the rate of one dollar and twenty-five cents on the one hundred dollars.

The ninety-fifth section provides that the "payment of de-

mands on the Treasury of said city and county, duly audited, may be made for the following objects, and none other:

\*   \*   \*   \*   \*   \*   \*

"*Fourth*—Coupons for interest due upon the San Francisco city stock, duly issued in pursuance of the act entitled 'An Act to authorize the Funding of the Floating Debt,' etc., passed May 1, 1857.

\*   \*   \*   \*   \*   \*   \*

"*Tenth*—The sum of fifty thousand dollars, annually, for the redemption of certificate of stock, mentioned in the fourth subdivision," etc.

The last clause of the ninety-ninth section repeals "all laws and parts of laws, so far as they conflict with the provisions of this act."

The question is, do the provisions of the act of 1856, above quoted, repeal so much of the fourth section of the Funding Act as authorizes the assessors to add to the assessment-roll the sum necessary to pay the interest on the funded debt, and $50,000 towards a sinking fund?

The general rule is, that a subsequent statute operates as a repeal of all former statutes inconsistent with its provisions. Apply the rule in this case, and there can be no doubt that the statute of 1856 repeals the portion of the Funding Act above referred to, irrespective of the repealing clause.

The statute of 1851 prescribes a mode of leying the tax, and raising the money to pay this liability. The statute of 1856 prescribes another and different mode; that is, it is to be paid out of the money to be levied and raised by the board of supervisors, under section seventy-one.

But it is claimed that the Funding Act is in the nature of a contract, and that it is not competent for the Legislature to interfere in any way with its provisions—not even to change the mode of taxation.

Doubtless, the funded debt constitutes a legal obligation, which neither the city nor the Legislature can destroy; but that there is a legal obligation to raise the tax in a particular manner, is simply absurd.

Taxation is the exercise of sovereign power. It can only be authorized by the Legislature, and is subject to no control, and, therefore, the repeal of a statute authorizing a tax, and directing the mode of collection, would necessarily render it impossible that the tax should be levied, although, at the time of the passage of the law, its very object is to provide for the payment of a debt authorized by the act, as in this case. It is not in the power of the Courts to compel the Legislature to levy a tax.

BALDWIN, J., delivered the opinion of the Court—TERRY, C. J., and FIELD, J., concurring.

Principles closely connected with this case apply to other cases which have been argued at the bar; and, although this particular case might be decided without passing upon some of these questions, it is deemed advisable to consider them somewhat at length, in this opinion.

This is a *certiorari* to review the proceedings of respondent, in making up the assessment-roll for the current year. The appellant followed the provisions of the fourth section of the Act of 1851, (Statutes of 1851, p. 388,) entitled "An Act to authorize the Funding of the Floating Debt of the City of San Francisco, and to provide for the Payment of the same." On receiving a requisition from the board of commissioners provided by that act, the assessor added to the assessment-roll of the current year the sum of $145,242, for the payment of interest, and $50,000 for the sinking fund.

The fourth section of the act of 1851 provides: "The said commissioners, previous to the making out of the general assessment-list, for the said city, in each and every year, shall certify and deliver to the city assessors the amount which shall be necessary to be raised for the payment of the interest of the debt so funded, for the current year, and the said assessors, in completing said assessment-list, shall add to the amount authorized by law to be raised thereon, for other purposes, the amount so certified for the payment of such interest, and also for the further sum of fifty thousand dollars, in each and every year, for the purpose of a sinking fund, for the redemption of such stock; the first moneys collected upon the whole of such general assessment-list, when so completed, shall be paid by the collector thereof into the city treasury, and by the city treasurer into the hands of said commissioners, as fast as collected; and no payment shall, either directly or indirectly, be made out of the moneys assessed or collected upon the said assessment-list, for any other purpose, until the amount, authorized by this section to be assessed and collected, shall have been actually paid over to said commissioners. The common council of the said city shall not have power to enact any provisions which shall prevent or hinder the immediate collection, in current coin, of the amounts authorized to be raised by this section, or otherwise contravene the provisions of this section; and, if any such provisions are attempted to be enacted, it shall be the duty of the city collector to disregard the same, and to collect, in current coin, the amounts by this section authorized to be assessed and collected. The said commissioners shall have the right, at all times, to inspect the books of the treasurer, assessor, and collectors of said city."

It is claimed, for respondent, that this act is repealed by the seventy-first and ninety-fifth sections of the Consolidation Act, as it is called. (Acts of 1856, pp. 164, 172.)

And the only question submitted for our decision is, whether the fourth section of the act of 1851 is in force or not. Those sections of the Consolidation Act are as follows :

"Section seventy-first—The board of supervisors shall have power to levy and collect, in the mode prescribed by law for assessment and collection of taxes, by tax each year, upon all property in said city and county, not exempt from taxation, such amount as they may deem sufficient to provide for the prompt payment of all demands upon the treasury thereof, authorized by this act to be paid out of the same; *provided*, that such taxation, exclusive of the State and school tax, shall in no case exceed the rate of one hundred and twenty-five cents on each hundred dollars' valuation upon the assessment-roll. The said board shall also levy and collect, in the same manner, such amount, not exceeding the rate of thirty-five cents on each hundred dollars' valuation, as aforesaid, as may be determined by the board of education to be necessary for the support of free common schools in said city and county."

"Section ninety-fifth—Payment of demands on the treasury of said city and county, duly audited, may be made for the following objects, and none others:

"*First*—The fixed salaries of police-captains and officers, chief of police, Police Judge, and clerk of the Police Judge's Court, may be paid out of moneys in the treasury belonging to the police fund; and, in defect thereof, out of the general fund.

"*Second*—The salaries or wages of teachers in the common schools, rents, repairs, building, and furnishing of school-houses, may be paid out of the school fund, as provided by law.

"*Third*—The salaries and fees, fixed by law, of all officers and employees of said city and county, including salary of the Judge of the Superior Court of the city of San Francisco, and the legal fees of jurors and witnesses in criminal cases, where the same are made payable out of the county treasury.

"*Fourth*—Coupons for interest due upon the San Francisco city stock, duly issued, in pursuance of the act entitled 'An Act to authorize the Funding of the Floating Debt of the City of San Francisco, and to provide for the Payment of the same,' passed May first, one thousand eight hundred and fifty-one.

"*Fifth*—Coupons for interest due on the bonds duly issued by the board of fund commissioners, in pursuance of the provisions of the act entitled 'An Act to provide for Funding the Legal and Equitable Debt of the City of San Francisco, and for Final Redemption of the same,' passed May seventh, one thousand eight hundred and fifty-five.

"*Sixth*—Coupons for interest due, duly issued by the commissioners for funding the floating debt of the county of San Francisco, in pursuance of the act entitled 'An Act to Fund the

Floating Debt of the County of San Francisco,' passed May fourth, one thousand eight hundred and fifty-two.

" *Seventh*—Coupons for interest due upon the bonds known as the 'fire bonds,' issued to the amount of two hundred thousand dollars, by the corporate authorities of the city of San Franciso, and bearing date December the first, one thousand eight hundred and fifty-four," etc.

The fifth section of the act of 1851 provides as follows: "The said commissioners shall receive into their custody all the moneys which shall be levied and collected for the purposes of this act. Out of the same they shall pay the interest of the said stock, at the times and places where the same shall become due and payable, out of such portions of the principal debt as they may be able to obtain for that purpose, as provided in section fourteen of this act; or, in case they shall not be able to obtain portions of such principal debt for that purpose, they shall securely invest such balance, and re-invest the interest and proceeds thereof, until they shall be able so to apply the same to the total extinguishment of such portions of the said debt as herein provided. They shall keep regular books of accounts and minutes of their proceedings, which shall be open at all times to the inspection of the mayor and comptroller of said city; and shall, within one month before the expiration of the fiscal year of the said city, transmit to the common council of the said city a statement, verified by the oath of one or more of said commissioners, showing the amount of moneys received and paid out by them, the expenditures by them made, the amount of stock outstanding, and the amount redeemed within the current year, the condition of the moneys and funds in their hands, and how the same are invested and secured; which statement the common council shall cause to be forthwith published. in a daily newspaper published in said city."

It will be seen, by reference to the whole of the act of 1851, that it is a law carefully and cautiously drawn, for the purpose of securing the payment of certain debts against the city of San Francisco. The creditors of the city were invited to surrender their claims, presently due, for bonds payable at distant periods, many of them, perhaps, drawing a larger rate of interest than that provided in this funding bill; and the chief inducement, it may readily be supposed, was the security for the prompt payment of the interest, and for the eventual payment of the principal. Accordingly, in the act by which the change of securities was provided, the particular security offered, and the exact mode and circumstances whereby it was to be made effectual, were expressed in clear and measured terms, leaving no doubt as to what was offered, and what was to be given and received. This was advertised and made known to the creditors. They examined these terms, it is to be presumed, with jealous scru-

tiny; and when they agreed to them, and surrendered their former evidences of indebtedness, and their right at once to enforce it, it was undoubtedly supposed by them, and they had a right to suppose, that the provisions of this law would be substantially carried out, according to its true spirit and meaning. This act, thus accepted by creditor and debtor, has every element of an executed contract. It entered into and forms a part of the money obligations executed in pursuance of it. It constitutes the very substance and sanction of those obligations, and induced their acceptance. It is apparent, in every clause and article of this clear and formal statute, that, not only was the fact of payment provided for, as part of this agreement, but that the mode of payment was considered as of much importance. The new arrangement seems to have originated in a spirit of distrust and uneasiness—the main purpose being security; a present nominal abatement being considered a prudent sacrifice to a certainty of ultimately getting principal and interest. For this purpose, a commission is organized; a trust, and trust fund, and trustees, were specially created. The city was not trusted to pay the debt. The city government were to be only agents to pay over the sums to be raised to these trustees or commissioners. The duties of these commissioners are clearly defined. The construction of this act has been given by this Court, in People ex rel. Tallant v. Woods, (7 Cal. 584.) The late Chief Justice says : " After a full re-examination of the case, I am satisfied that our former opinion was wrong. The error consisted in assuming that the act to fund the indebtedness of the city was a simple legislative provision, whereby a fund was provided to secure an antecedent debt, when, in fact, it must be regarded as a law, authorizing a contract between the city of San Francisco and her creditors, who surrendered the old indebtedness, which was a present charge against her, and took a new security, or bonds, bearing a different rate of interest, in lieu thereof. This transaction between the city and the scrip-holders was in the nature of a new contract, and having been entered into in conformity with the provisions of a law expressly authorizing the parties to contract, in the mode they have, it follows that the law entered into and became a part of the contract, and that it can not be so altered or amended as to impair or destroy the rights of the parties, or the security which was the moving consideration between them. * * In the present case, the effect of the Consolidation Act, if maintained, would be to withdraw from the hands of the commissioners of the funded debt a large amount of money which they are authorized to loan for the benefit of bond-holders, and the direct consequence is to diminish the fund out of which they they are entitled to be paid. Such legislation is obnoxious to that provision of the State and

Federal Constitutions which forbids the Legislature from passing laws impairing the obligations of contracts."

The city of San Francisco, though a municipal corporation, is under the same moral and legal obligation to pay her debts as an individual citizen. She must, and may, as well be made to comply with her contracts, as a private person; and we can not see why her contracts are not as obligatory as to the mode in which she agrees to perform them, as in respect to the time, or place, or fact of performance. We consider the act) a private act, it is true, but none the less binding on that account) as substantially a trust-deed, whereby she agrees, on a valuable consideration, to place in the hands of certain trustees so much of her revenue and property, to be applied by the trustees to the redemption of her obligations, in the mode and according to the terms of her agreement. It is too clear for argument, that, if a private individual owes debts, and has rents or income, and pledges these to pay his debts to his creditors, the property and income must be so appropriated. Why not a corporation? The law makes no distinction as between these classes of debtors in this respect, and we see no reason why the Courts should.

The act of 1851 being of this character, it was not competent for the Legislature to substantially change its terms, without the sanction of the creditors. And it therefore becomes unnecessary that we should scan the provisions of the act of 1856 to see whether there is any irreconcilable conflict between the latter and the former acts. We are saved the necessity of wandering through the mazes of the complex, though, on the whole, beneficial contrivance, called the Consolidation Bill; for it is immaterial whether, in its material features, it does or does not conflict with the act of 1851, for in either case the act must, in substance, prevail.

It is urged that the city can not be forced to levy taxes to raise the money to be paid to these trustees. We do not admit this pretension to be well founded; nor, if it were, do we see that it would follow that, after having levied them, the local government can dispose of them as it pleases. A man pledging the fruits of his labor to pay his debts, may not be compelled by his creditor to work; but, if he does work, and earns the money, we suppose it could scarcely be held that he may dispose of the money as he chooses.

The question is not whether, by a legislative alteration of a contract, a party is to be injured seriously, or only slightly. He has a right to the substance of the contract as he has made it. It is his privilege to judge for himself whether it is for his interest for the agreement to be discharged in a particular way stipulated, or in a different mode; and neither the Courts nor the Legislature can change it in any substantial particular. We say in any substantial particular: for it is not necessary to hold,

in this case, that this corporation, exercising the powers of a local government, with a uniform fiscal system, might not, in order to the enforcement of the responsibility of its officers, or to preserve regularity in its transactions, prescribe some rules—such as the manner of taking receipts, or vouchers, or making entries, or the mode of making assessments, and the like formal matters in connection with the payment of this money; but nothing which adds any new risks, delays, or embarrassments, to the execution of this contract as it is written, can be grafted on its original terms.

Judge Story thus announces the constitutional rule : "The invalidity of a State law, as impairing the obligation of contracts, does not depend upon the extent of the change which the law makes in the contract, and the Supreme Court of Mass., in Blanchard v. Russell, (13 Mass. R., 16,) say : 'A law made after the existence of a contract, which alters the terms of it, by rendering it less beneficial to the creditor, or by defeating any of the terms which the parties agreed upon, essentially impairs its obligations; and, for aught we see, is a direct violation of the Constitution of the United States.'"

The Supreme Court of Georgia, in Winter v. Jones, (10 Georgia Rep., 190,) say : "A constitutional act of the Legislature is equivalent to a contract, and, when performed, is a contract executed, and whatever rights are thereby created, a subsequent Legislature can not impair. (See, also, to same effect, 15 How. U. S. Rep.; 10 How., 205; New Jersey v. Wilson, 7 Cranch, 166; Robinson v. Magee, 9 Cal. R., 81.)

The right of the creditor, under the act of 1851, (fourth section,) is declared too explicitly to be misunderstood—the assessor is to add to the assessment-list the amount of the interest and the $50,000. This is, however, a mere mode of raising these sums. The substantial right is, that this sum shall certainly be raised, and that the first moneys collected upon the whole general assessment-list are to be paid to the treasurer, and by the treasurer into the hands of *the commissioners as soon as collected,* and, as if mere words were insufficiently expressive when confined to the prescribing of a duty of prompt payment by the treasurer to the commissioners, it is provided that no money shall be applied to any other purpose out of the whole body of the taxes paid in, until the amount coming to the commissioners be paid. Not satisfied with this, it is also provided that the commissioners shall receive into their custody the money, etc.; shall pay the interest of the stock at the times and places, etc.; (see § 5,) and, by section seven, the District Court is expressly given jurisdiction to enforce the provisions of the act by summary proceedings—by *distringas, attachment, mandamus,* and *sequestration;* and, as if this were not enough, any public officer violating these provisions is held to criminal responsibility.

People v. Bond.

It will be seen that the city assessor and the city treasurer, by the act of 1851, are put in direct relations with the commissioners, and that clear and definite duties are assigned to them, respectively, of a simple ministerial character. No one else is authorized to intervene between them, or to disturb these relations. Neither the old city government nor the present city and county government, neither the mayor and council nor the board of supervisors, have any such authority; and especially—though these bodies might see to the safety of this fund, as well as any other portion of the city municipal finances, while in the treasury—have they no right or authority to prevent its instant payment by the treasurer, in pursuance of law, to the commissioners. It is just as incompetent for the Legislature to subject this money, lying in the treasury in trust for the commissioners, and immediately payable to them, to the supervision, discretion, or control of the board of supervisors, as it would be incompetent to add any other term to the contract, or to declare that A should not pay B a debt past due until payment of it had received the sanction of C. The debt is due and liquidated; every term of the contract is settled; nothing remains to be done but the fact of immediate payment by the treasurer. It requires no auditing. The propriety of the payment is not to be passed upon; the simple ministerial duty of counting and handing over the money by the treasurer, who, alone, is trusted with that duty, remains, and *he* must discharge that legal duty, thus cast upon him, and not wait until it pleases the supervisors to meet, and, meeting, to take up the question, and, taking it up, allow it to be paid or not, at their discretion. If this were admissible, the contract would read, not that this money shall be the first paid, immediately, or as fast as collected by the treasurer, to the commissioners, but the agreement would be that the money shall be paid whenever it suits the supervisors to order the treasurer to pay it, and not paid at all if they do not so order. This was not the contract, in its letter or in its substance.

The only question in this case, therefore, is this: Does the provision in the Consolidation Act which empowers the supervisors to levy a tax for municipal purposes—that tax being sufficient for the payment of the sums provided by the act of 1851 to be paid to the commissioners—does this provision stand in substantial conflict with the fourth section of the act of 1851? We think not; for there is a clear and adequate provision for the payment of moneys into the municipal treasury, out of which the commissioners are entitled to the sum to be paid by them in priority of all other claims. The substance of the provisions of the act of 1851 is, that a sufficient sum of money to answer the purposes of that act shall be collected by taxation, and having been collected and paid to the treasurer of the corporation, it stands as a trust fund which the treasurer, as the bailee of this

sum, is to pay to the commissioners. The commissioners had a right to it when thus collected and paid, and the amount is settled; this sum may be collected in one way or another—by one process or another; and the method prescribed by the Consolidation Act seems to be as effectual and secure as that provided by the act of 1851. This being so, we see nothing in the act of 1856—which simply alters *the mode* of levying taxes, the result not being changed—which, in substance, conflicts with the act of 1851 in those provisions which offered a security to the creditors for their debts. It is just as clear, that the law does not contemplate the imposition of double taxation in any one year for the purpose of raising the money provided by the act of 1851; and therefore the terms of the act of 1856, in this respect, supersede those provisions in the act of 1851, which declare the duty of the assessor to add to the list the several sums of money which are intended to be raised by the act of 1851.

Therefore, the judgment of the District Court is affirmed.