## ENGLISH *v.* BOARD OF SUPERVISORS OF THE CITY AND COUNTY OF SACRAMENTO.

THE Act of 1854, entitled, "An Act to Fund the Floating Debt of Sacramento County and to provide for the Payment of the same"—authorizing the issuance of bonds, payable in ten years, for the indebtedness of the county then due, and making it the duty of the county authorities to assess annually, in addition to the taxes then authorized by law, a tax of one-fourth of one per cent. upon all the taxable property of the county as a Sinking Fund for the gradual redemption of the bonds issued under the act—when executed by the county creditors, by accepting the bonds in lieu of their former claims, became an inviolable contract, and the county authorities are bound to levy the tax for the Sinking Fund.

This provision in the act, for assessing an annual tax as a Sinking Fund, becomes, upon the execution of the bonds and cancellation of the original claims, a part of the contract, and is the sanction and security provided by law for the performance of the contract. This annual tax is a fund pledged.

The case might be different if the bonds had been executed before the passage of the law, and then provision had been made by the act for levying the tax for their payment. The act in such case would be an ordinary act of legislation, subject to repeal—a mere voluntary provision by the debtor, or on his behalf, for payment of his debt.

When the county issued the bonds and received therefor the evidences of its original indebtedness, the county made a contract with the creditors to collect this tax; and this contract can be enforced as well as the claim of the creditors to the money, if it were collected and in the treasury, could be enforced; and such a claim would be perfect.

The facts that the Act of 1854 cast the duty of levying this tax upon the Court of Sessions, and that by the General Act of 1855 the powers, other than criminal, conferred on such Court by any law were cast upon the Board of Supervisors, do not impair the obligation of the provisions of the Act of 1854 as a contract between the bondholders and the county. Such a change in the tribunal directed to levy the tax is within the power of the Legislature.

*McDonald* v. *Maddux* (11 Cal. 187) does not conflict with the doctrine of this case. There was no contract in that case.

The Act of 1854 is no cession or surrender of the taxing power of the State; but is rather an agreement and authority to exercise the taxing power for a particular purpose.

If the Consolidation Act for Sacramento be in conflict with this fifth section of the Act of 1854, the former must yield.

APPEAL from the Sixth District.

The nature of the suit, and the provisions of the Act of 1854, in question, are stated by the Court. The further facts are:

English *v.* Supervisors of Sacramento.

1. That on the first of May, 1854, Charles H. Swift held legal and proper indebtedness against the county, amounting to $1,000 ; that said indebtedness was surrendered up by said Swift, and canceled by the Fund Commissioners, as required by law, and the bond set out in plaintiff's complaint duly issued in lieu thereof.  2. That all of the floating indebtedness against said county, which had accrued prior to the first day of May, 1854, was surrendered up and canceled, and bonds duly issued therefor, as required by said act ; and that said bonds were issued in strict accordance with the provisions of said act.  3. That the Court of Sessions, and the Board of Supervisors, as the legal and proper successor of said Court, did, up to and including the year 1857, levy and assess the tax .required by said act ; and that the County Auditor and Treasurer, during all that time, performed all the duties which by said act they were required to do ; and that since that date, the Board of Supervisors and the Auditor and Treasurer have refused and still refuse to comply with the provisions of said act.  It was also admitted, that all the bonds issued as aforesaid were redeemed and canceled prior to the first day of July, 1858, except between thirty and forty thousand dollars thereof, which are yet outstanding and unredeemed.  It was further admitted, that the plaintiff was the legal owner and holder of the bond sued on.  The case was submitted to the Court upon the pleadings, and the *mandamus* was denied.  Plaintiff appeals.

*Geo. R. Moore,* for Appellant.

I.   The Law of 1854 was not repealed by the Consolidation Act of 1858.

II.   If the Court should hold that the Act of 1854 is repealed by the Consolidation Act of 1858, then we submit that the latter act, so far as the rights of appellant are concerned, is in conflict with section ten of article one of the Constitution of the United States, and section sixteen of article one of the Constitution of this State, and therefore void.   These sections provide, that " no *ex post facto* law, or law impairing the obligation of contracts, shall ever be passed."

Under the Funding Law of 1854, all of the outstanding indebt-

edness against the county of Sacramento was surrendered up and canceled, and bonds in lieu thereof were issued.   These bonds were made payable in ten years from that date, and were to bear interest at the rate of ten per cent. per annum.   A fund was also created, which was to be set apart and dedicated to the payment of the annual interest, and as a Sinking Fund for the gradual redemption of these bonds.   Under these assurances, and with a security pledged for the ultimate payment of these claims, the holders of county indebtedness entered into and accepted the contract proposed by the Legislature, and surrendered up the evidences of their demands, which were then soon to fall due, and received these bonds, payable at a distant day, under the solemn promise, on the part of the Government, that the fund to be raised was to be sacredly held for the payment and redemption of these bonds when they should become due.   This was the inducement held out by the State and county to the creditors of the county, to enter into the arrangement and postpone the payment of their demands for ten years.   That this law was and is, to all intents and purposes, a contract between the Government and the bondholder, is as well settled as any legal proposition can be.   This question has frequently been before the Supreme Court of the United States and various State Courts, and, with one or two exceptions, in every instance decided in favor of our views in this case.   (*State Bank of Ohio* v. *Knoop,* 16 How. 376 ; *Fletcher* v. *Peck,* 6 Cranch, 135 ; *The State of New Jersey* v. *Wilson,* 7 Id. 264 ; *People* v. *Platt,* 17 Johns, 208 ; *Gordon* v. *The Appeal Tax,* 3 How. 133 ; *People* v. *Wood,* 7 Cal. 579 ; *People* v. *Bond,* 10 Id. 563 ; *McCauley & Tevis* v. *Brooks,* 16 Id. 33 ; *The People* v. *Tillinghast,* 10 Id. 584 ; *Dartmouth College* v. *Woodward,* 4 Wheat. 636 ; *Planter's Bank of Miss.* v. *Sharp,* 6 How. 326 ; *Osborne* v. *Humphrey,* 7 Conn. 335 ; *Seymour* v. *Hartford,* 21 Id. 485 ; *Fellows* v. *Pinney,* 19 Vt. 526; *Armington* v. *Barnet,* 12 Id. 745, 752 ; *Brewster* v. *Hough,* 10 N. H. 138, 142; *Backus* v. *Lebanon,* 11 Id. 20 ; *Charles River Bridge* v. *Warren Bridge,* 7 Pick. 344 ; *Chesapeake & Ohio Canal* v. *B. & R. R. Co.,* 4 Gill. & Johns, 1 ; *Lewis* v. *Brackenridge,* 1 Black. 220 ; *University of Maryland* v. *Williams,* 9 Gill & John, 402 ; *Aberdeen Academy* v. *Mayor*

*of Aberdeen,* 13 Smed. & Marsh. 645 ; *Young* v. *Harrison,* 6 Geo. 130 ; *Bush* v. *Shipman,* 4 Scam. Ill. 190 ; *Michigan Bank* v. *Hastings,* 1 Doug. Mich. 225 ; *The State* v. *Hayward,* 3 Rich. S. C. 389.)

These cases are but a small portion of the mass of authorities ; but sufficient to establish my proposition.   The decisions upon this subject are uniform, with the exception of the State of Ohio, where there is a conflict.   The Supreme Court of that State for nearly fifty years, under the Constitution of 1802, held these laws to be contracts, which no subsequent Legislature could change ; but under the new Constitution of that State, which does not seem to differ much from the old one upon this subject, the Court has decided the question both ways.   But whenever the decision has been in favor of the constitutionality of the repealing act, it has been reversed by the Supreme Court of the United States.

III.   The Act of 1854 is no surrender of the taxing power.   It does not follow that because a State in its sovereign will and power has made a contract with an individual, based upon a good and full consideration, which the fundamental law of the land will not permit her to violate at pleasure, that therefore she has parted with any of her attributes of sovereignty.   On the contrary, the fact that a State can make a contract which she cannot avoid is the highest evidence of sovereign power.   If it were otherwise, a State Government could not exist for a moment.   It is because she can pledge her faith irrevocably, that she is able to borrow money, induce individuals to enter into schemes of internal improvements, and do a thousand other things which she could not do were a contrary rule established.   Who would deal with a State, if it were admitted that the Legislature of this year could strip the contract which you had made with its predecessor of its vital substance, and leave you unprotected and ruined ?

Counsel lose sight of the distinction between pledging a revenue to a particular purpose, and selling or pledging the power to raise the revenue.   Because a man pledges the property that he has earned by his labor to secure the payment of an honest debt, it does not follow, therefore, that he does or can mortgage the muscles by the action of which he acquired the property.

A State through its Legislature can raise all necessary taxes for the support of government, or it can refuse to raise any, or it can tax a part of the property and exempt the balance; in fine, it has supreme control over the subject of taxation where its action does not interfere with vested rights. (*The State Bank of Ohio* v. *Knoop*, 16 How. 369; *Providence Bank* v. *Billings*, 4 Pet. 515; *Osborne* v. *Humphrey*, 7 Conn. 335; *Ohio Life Insurance and Trust Co.* v. *Debolt*, 16 How. 427.)

In fact, this question is directly or incidentally discussed in nearly all the cases cited upon the other point, and is as well settled as any proposition in the books. There are no authorities produced against it except the cases from Ohio; and there we find that for nearly half a century they held the same doctrine, and only decided the other way, as they themselves say, as a matter of State policy.

IV. It is contended by respondents' counsel that because the Act of 1854, authorizing the Court of Sessions to levy the tax in question is invalid, that the appellant is not entitled to any of the benefits resulting from the contract.

It is not pretended by them that the bonds were not properly issued, or that they are not binding on the county, but merely that the mode of raising the fund to pay them was illegal. In answer, we say that although the Court of Sessions had no power to levy this tax, yet the tax was so raised, without objection, until a law was passed in 1855, providing for the assessment by a legal and constitutional power. The law authorizing the Court of Sessions to levy the tax performed its functions before any objection was interposed, and was succeded by an act against which no objections can be urged.

Again, the mode of levying the tax was not so important a part of the contract as that portion which provided that a tax should be levied; and if the means provided for raising the fund could not be made available for that purpose, this did not affect that part of the contract which provided that a fund should be raised.

The law of 1854 would have been equally valuable to bond-holders if it had depended upon subsequent legislation for enforcement, provided that such subsequent act were passed, as it was in this case. When the law of 1855, authorizing the Board of Super-

visors to make the assessment, was passed, it simply provided a remedy for the enforcement of the Act of 1854 ; and by operation of law was incorporated into and became a part of the original contract, and the appellant would be as much entitled to its remedial benefits as though it had been a part of the old law.   (*The Pittsburg Turnpike Co.* v. *Commonwealth*, 2 Watts, 433.)

This Court has frequently decided that the Act of 1855, transferring duties which had theretofore been performed by the Court of Sessions to the Board of Supervisors, was constitutional and valid.

*C. Cole, District Attorney,* for Respondent.

*McDonald* v. *Maddux, Treasurer of Sacramento county,* (11 Cal. 187) controls this case.   That was, like this, an application for *mandamus;* it arose in the same county and involved every question upon which a decision is sought here.   It was there held, that the Funding Act of 1854, which forbade the redemption of any unbonded indebtedness which existed prior to a certain date, was obligatory upon the county officers.   In accordance with that decision, it is now maintained by respondents that the Act of April 24th, 1858, (Stat. of 1858, 267) funding the indebtedness of the city and county of Sacramento, (280) and forbidding the payment of claims, " except in the manner therein provided," (secs. 37, 38) is likewise obligatory upon the county officers, or rather city and county officers.

The Legislature is the paramount political power, and can control and direct the Board of Supervisors in the matter of levying taxes.   This the Legislature has done, (in sec. 34, p. 278) by declaring that " the Board of Supervisors shall not have power to levy any greater taxes than as follows," etc.   This is an absolute bar to the remedy which the petitioner seeks.

A similar obstacle is in the way of the Auditor and Treasurer acting in the premises.   If the tax sought by petitioner were levied and collected, it would then have to be placed in the several funds mentioned in section thirty-six of said act ; and any such appropriation of it as petitioner desires would subject the Treasurer (sec. 12) and the Auditor (sec. 36) to severe punishments.

But the proposition of the petitioner in this case is very much broader than the one overruled in *McDonald* v. *Maddux*. There the money was actually in the treasury, and the Board of Supervisors had ordered it paid out, which order the Treasurer refused to obey, and the proceeding in that case was to compel him to obey. But the Court held he was inhibited by the Legislature from doing it.

In the case at bar, the proposition is to compel the Board of Supervisors to raise the money against a plain legislative enactment, and then to appropriate it in direct violation of law. It is as if the Court were to undertake by *mandamus* to compel a debtor to work and earn money and pay off a note ; and that, too, one that was outlawed.

Petitioner had a year and a half in which to fund his claim under the law of 1858. (Stat. of 1859, 359.) Having neglected to do this, his demand at present is in the position of an outlawed debt.

It is alleged by appellant's counsel, that the Legislature had no power to compel a party to change the form of his demand against the city and county ; and with equal truth it might be said that there is no power to compel a man to collect a note before it is outlawed.

It is optional with the scrip holder in the one case to fund, and with the holder of the note in the other to sue ; and either would neglect at his peril. " *Vigilantibus, non dormientibus, jura subveniunt.*"

The unfunded claim of appellant was postponed by the Act of 1858, as was the unfunded claim of McDonald by the Act of 1854. The Act of 1854 was repealed by the Act of 1858, sec. 74.

*Shafters, Heydenfeldt & Goold,* also for Respondent.

I.    It is conceded that if the Legislature of California made with appellant a contract, no subsequent Legislature can impair its force and efficacy.

And the first question that presents itself is : Can any Legislature of California make a contract with any one, clothing him with a vested interest in the taxing power of the State ?

The appellant asserts a right to the enforcement of a law of taxation for his individual interest.    He treats the repeal of the law as

utterly null and void, and he therefore holds up before the Court the law providing for the levying of a tax as his private property, and asks protection of it as such.  He asserts that the consideration for his surrender of the evidence of his original claim was the acquisition of an interest in the revenue laws, sufficient to compel the collection of its substitute—*i. e.*, the bond he took—and that this power of collection entered into and made a part of the contract by which, in surrendering the old debt, the new one was created ; and that this contract, in all its entirety, is now beyond the control of the Legislature.

In opposition to this, the respondent maintains that the power of taxation is an element of sovereignty ; that neither this power nor any other of the attributes of sovereignty furnishes the subject matter of a contract; that no man can acquire by gift, sale or barter, or by any agreement whatsoever, an *interest or a property* in the taxing power of the State, or any right, with or without consideration, to impede or to enforce the exercise of this power ; and that, unless authorized by the organic law, the Legislature of the State cannot disable itself from recalling, at any time, the power of taxation, though bestowed on a citizen by legislative act—no matter in how solemn a form, and no matter if transferred with or without consideration.

The county being a part of the government of the State, the debt is the debt of the State.

A county is but a political division of a State.    (1 Black. Com. 113.)

" The Legislature shall establish a system of county and town governments, which shall be as nearly uniform as practicable throughout the State."    (Const. of Cal. Art. XI, Sec. 4 ; Art. XII, Sec. 14 ; Art. VI, Sec. 1 ; Art. IV, Sec. 4.)

"A county government is a portion of the State government, and the county debt, created by authority of law, is a part of the public State debt," etc.    (*Hunsacker* v. *Borden*, 5 Cal. 290.)

" The several counties are nothing more than certain portions of territory into which the State is divided, for the more convenient exercise of the powers of government.   They form, together, one political body, in which the sovereignty resides."   ( *State of Maryland* v. *Baltimore R. R.*, 3 How. 550.)

The appellant pretends that, for a valuable consideration, he acquired the right to the enforcement of this tax law for his individual advantage.   If he did, then the Legislature might have sold him the taxing power of the county for a hundred years.   Nay, it might have transferred to him the taxing power of the State itself, for that or any other length of time.   That this power was to be exercised for his use and benefit, during ten years only, makes not the slightest difference in the principle involved.   If the taxing power may be disposed of for a day, it may be transferred for a week—a month—a year, or any given number of years.   The question is not as to the mode of exercising the power of transferring the right of taxation, but as to its existence.   If it exist, of course there is no limit to its exercise, save in the mere discretion of the Legislature.   (*Brown* v. *The State of Maryland,* 12 Wheat. 419.)

The power of taxation is vital to the State.   Without it, the Government must come to an end.   It is a power inherent in all government; and is by its very nature inalienable.   It cannot be parted with ; for being the life-blood of the State, to lose it were nothing short of political suicide.   It is and must be inviolable, indestructible.   It is and must remain sacred to the purposes of government; indeed, it is a part and parcel of the Government itself.   (Federalist, XXX, XXXI.)

The taxing power is a trust committed to the members of the Legislature, and while in office, they must wield this power for the benefit of their constitutents ; and must keep and preserve, and finally transmit it unimpaired to their successors in office. (Domat Pub. Law, L. 1, tit. 6, sec. 1, par. 12 ; Puff, L. 8, ch. 5, sec. 7 ; Vin. Ab. Prerog. ; *Brewster* v. *Hough,* 10 N. H. 142 ; *Mott* v. *Penn. R. R. Co.,* 20 Penn. 9 ; 1 Ohio, 563 ; Id. 603 ; Id. 591 ; Id. 623 ; 3 Id. 586.)

[Counsel here go into an elaborate review of the principal authorities cited by appellant, and contend that the precise question here was neither involved nor decided in most of them ; and as to the decisions of the Supreme Court of the United States in the Ohio cases, (1 Ohio, 563, 603, 591, 623 ; 3 Id. 586)—to be found in 16 How. 369, 416 ; 18 Id. 331—that the only point decided is, that if there be a contract made by a Legislature to vest in an in-

dividual such an interest in the taxing power as will disable future Legislatures from repealing the law in which the contract is embodied, the contract will be protected by the Federal Constitution, if it were sanctioned by the Constitution of the State, and not otherwise ; that the real difference between the Ohio Court and the Supreme Court of the United States was in reference to the influence of the Constitution of Ohio ; that the former held that the Constitution of 1802 did not permit the Legislative contract, the latter that it did ; and relied on the acquiescence of the authorities of Ohio, in the words of the Chief Justice, " for nearly half a century," to prove it (18 How. 431) ; that such of the State Courts as have considered the matter are with respondent, and those portions of the opinions of the Justices of the Supreme Federal Court that apparently recognize the existence of the power contended for by the appellant here, refer to a power constitutionally conferred upon the law-maker, and having its origin in the source of all power, to wit: the people, in their primary, sovereign capacity.—REP.]

II.   The appellant cannot be said to have trusted to the fifth section of the act authorizing the funding of the floating debt, since that section is null and void, being repugnant to the Constitution of the State, for the reason that it purports to impose upon the Court of Sessions the duties of a Board of Aldermen or Common Council, or a Board of Supervisors or Assessors—powers of an executive nature, and not at all partaking of a judicial character.   (5 Cal. 19 ; 10 Id. 403.)

The theory of the appellant is, that when he took the bond sued on, he must have known of the existence of the fifth section, which provides for the assessment of taxes by the Court of Sessions to pay him, and therefore it was in his contemplation at the time and so became a part of his contract.   In other words, the appellant says he knew the law.   Now the Constitution, which is the fundamental law, stamps upon this fifth section the character of utter nullity ; and therefore the appellant knew there was no such law as he pretends furnishing him a pledge for the payment of his bond.

Nor can he derive any aid from the Act of 1855.   Its language is : " The Board of Supervisors shall have and exercise, in its

county, all jurisdiction and powers other than criminal conferred by any law on the Court of Sessions, or heretofore exercised by said Court under any statute or by any statute provided to be exercised by said Court, when the same does not conflict with the provisions of this act." In the first place, the power of assessing a tax never was conferred upon the Court of Sessions, since the Constitution forbade it to be done ; and secondly, the appellant trusted to no assessment by the Board of Supervisors, for that body was not authorized to meddle with the debts of the county until March, 1855, more than eight months after the bonds had been issued.

Assuming that this law *per se* did empower them to levy the tax, which it plainly did not, the most that can be said is that the appellant may have been inspired with hopes that his bonds would be provided for ; but the hopes or expectations of a citizen garnered up in laws of a public nature must yield to the public policy which dictates their repeal. *Salus populi est suprema lex.* " A plain distinction exists between the statutes which create hopes, expectations, faculties, conditions, and those which form contracts." (Campbell, J. 16 How. 408.)

The appellant expects to recover because the law repealing the fifth section of the act creating his bond is unconstitutional. We show that the fifth section, for two reasons, is itself unconstitutional, and that should end the case.

BALDWIN, J. delivered the opinion of the Court—FIELD, C. J. concurring.

Application for *mandamus* against defendants to compel them to levy and assess a tax of one-fourth of one per cent. on all the taxable property of the county, to be set apart as a sinking fund for the gradual redemption of the outstanding bonds, issued under the Act of 1854, entitled " An Act to Fund the Floating Debt of Sacramento County, and to provide for the Payment of the same." (See Laws of 1854, 201.) By this act the county of Sacramento was authorized to fund its floating debt, Commissioners were appointed for that purpose, the power was given them to issue bonds, etc. By the fourth section it is provided, that of the moneys re-

ceived by the County Treasurer from the taxes assessed for county purposes, there shall be first set apart a sum sufficient to pay the January interest on said bonds, " and no payment shall be made except upon account of said interest from the treasury until such amount is secured ; and from the same fund there shall be set apart, previous to the first of June in each year, a sum sufficient to pay the July interest on said bonds." The fifth section is that mainly insisted on as giving the rights claimed by the plaintiff here. It is in these words : " Section 5. It shall be the duty of the Court of Sessions of said county to assess annually, in addition to the taxes now by law authorized to be assessed, a tax of one-fourth of one per cent. upon all the taxable property of the county as a sinking fund, for the gradual redemption of the bonds issued by virtue of this act." By the Act of 1855, the duties of a civil character, which by previous acts had been cast upon the Court of Sessions, were cast upon the Boards of Supervisors for the respective counties. The plaintiff here is the holder of one of the bonds issued under this Funding Act, and in pursuance of its provisions he claims that this act assures to him, as a part of his contract, the right to demand that the fifth section of the Act of 1854 shall be carried into effect, and prays that the defendants be ordered to levy the tax therein mentioned.

The question involved is, whether this provision of the Act of 1854 entered into and formed part of the contracts—the bonds— executed in pursuance of its provisions. Before the passage of the Act of 1854, the plaintiff or his assignor held claims which we assume to have been valid debts against the county. It may be that he had no means of enforcing payment by the ordinary process of legal coercion. But still as high an obligation, moral and honorary, rested upon the county to pay them. This obligation, if no provision otherwise existed, might have been enforced by the Legislature, and it is to be presumed it would have been upon proper representation by the parties interested. After the passage of the act and in accordance with its provisions, the holders of this indebtedness exchanged their claims presently due, for bonds payable ten years after date, with interest at the rate of ten per cent. per annum ; after which act the holders, of course, had no claim for immediate

payment, or other payment than according to the terms of the bonds. This surrender, therefore, and this change of securities, were a good consideration for the instruments executed by the county. As an inducement to the holders to fund the debts, the provisions before referred to were inserted in the act; and we must presume that the creditors of the county relied upon them as their security for the payment of the bonds. The act and the bonds issued in pursuance of its provisions must be taken together. Indeed, the act is an authority given for a contract on these terms; and we do not see that it is not as inviolable as a trust-deed would be, pledging certain revenue, to be raised in a prescribed mode, for the payment of the debt. Though this tax was to be levied in advance of the maturity of the debt, yet this fund was a necessary provision to its ultimate payment. The collection and preservation of this fund gave value to the bonds as money securities, and by a gradual process of accumulation, assured the ultimate payment, by removing the apprehension that a heavy tax for the payment of old debts, laid at or near the end of the ten years, and coming all at once upon the taxpayers, might not be levied or collected. The section providing for this Sinking Fund, therefore, was a most important term in this arrangement; and it would not be an act of justice or good faith to refuse to give effect to it. We have decided the principle of this case in several cases. (See *People* v. *Bond*, 10 Cal. 563; *People* v. *Tillinghast*, Id. 584; *McCauley et al.* v. *Brooks*, 16 Id. 11.)

It is true that the act makes it the duty of the Court of Sessions to levy this tax; but it was in the power of the Legislature, as we have heretofore held, to give validity to acts of this sort, by the general act of 1855, which declares that the powers conferred on the Court of Sessions by any law shall be exercised by the Board of Supervisors. We think this amendment made by the Legislature to this Funding Act, in the change of the tribunal directed to levy the tax, did not impair the obligation of its provisions as a contract between the bond holders and the county. We see nothing in the case of *McDonald* v. *Maddux* (11 Cal. 187) which at all clashes with the doctrine here asserted. That case merely held that the Legislature may direct the mode and time of payment of municipal

English *v.* Supervisors of Sacramento.

debts, and prescribe the debts so to be paid, and in what order. It has the right of the debtor it represents in this respect; but this supposes that the Legislature has not already charged the fund so to be used by a valid contract. But a Legislature has no more right to violate a contract than an individual; nor can it authorize any person, natural or artificial, to do so. This we have decided in several cases, and it is a plain and well recognized principle of constitutional law. In the case of McDonald, there was no contract shown pledging any fund to the payment of any debt. We think that by the Act of 1854, now under consideration, a fund was pledged, as in the case of Bond, and this was done by the very act under which the contracts were executed. We see no difference between pledging a fund *to be* raised in a certain way, and a fund already in hand. In either case, the provision is a contract, whereby money, whether levied or not, raised by assessment laid upon property, is devoted to a specific purpose. This provision, made prior to the execution of the contracts—the bonds here—becomes a part of the contract, and furnishes the security and sanction provided by law for the performance of the contract, and has, upon the execution of the bonds and the cancellation of the claims provided for, every element of a valid and irrevocable agreement, so far as the substantial matter of the act is concerned. The case might be different if these bonds had already been executed, and this provision had been made for their payment; the act would then be an ordinary act of legislation, subject to repeal; a mere voluntary provision by the debtor, or on his behalf, for the payment of his debt. But when an act is passed authorizing bonds to be issued upon certain terms, and among these a provision for payment or security, these terms go with the bonds, and are as well the sanction as the inducements of the contract.

It becomes unnecessary in this view to inquire whether the Consolidation Act of 1858 is in conflict with this provision of the Act of 1854. If it is not, of course the Act of 1854 is not repealed. If it is, the Consolidation Act must, in this respect, yield to the law of 1854.

We are aware, as has been suggested, that the burdens upon the taxpayers of Sacramento are heavy enough already, and that

the people of that county are the more entitled to sympathy from the honorable submission they have made to these burdens, rather than seek refuge in disreputable shifts to avoid payment of their obligations. But we cannot afford them relief or protect them from further taxation, if such be the result of this decision, at the expense of what we deem to be the plain injunctions of the Constitution, and of the legal rights of the plaintiff and those representing like claims.

Judgment reversed and cause remanded.

A petition for rehearing having been filed, the case was again heard at the October term, when BALDWIN, J. delivered the opinion of the Court—FIELD, C. J. and COPE, J. concurring.

We have given an attentive consideration to the argument of the respondents' counsel. We adhere to the conclusions announced in the original opinion. The argument is, that the Legislature has no irrevocable power to pledge by law the future revenues of a county derived from taxation to the payment of a debt of the county, or to so bind the local authorities to levy or set apart a particular tax for such purpose, since this is the exercise of a sovereign power of taxation, and the Legislature cannot divest itself of this power. And some cases are cited to show that the Legislature cannot part by contract with its sovereign faculties, and that even a stipulation by one Legislature not to exert them—as in case of a permanent exemption of certain property from taxation—is not binding upon a succeeding Legislature. However this may be, the principle does not come up to the requirements of this case. Here the county owed certain debts which it was legally and morally bound to pay. It entered, with the consent of the Legislature, into a solemn arrangement with its creditors to pay them, and to that payment its faith and credit were pledged. It exchanged its indebtedness, presently due, for bonds payable at a distant period, and bearing a lower rate of interest. Commissioners were appointed to execute these bonds. A special tax was provided to pay the interest and for a sinking fund. The mode in which the tax was to be levied on the property of the county and applied, was specific. The county agreed, having full power for that purpose, that it would levy and

collect and pay over the fund.   The Legislature gave the power.
The question is not whether the Legislature can divest itself of the
taxing power—for it may go on now and levy taxes as well as be-
fore the act, upon the people and property of Sacramento; but the
real question is, whether it *can exercise* the taxing power, or author-
ize the county of Sacramento to exercise it, and when exercised
the act be in the nature of a contract, under the circumstances
here, which contract cannot be repealed.   The act relied on is the
Act of 1854.   By that act and that of 1855, the Supervisors are
bound, as part of the contract for funding the bonds, to assess a
tax of one-fourth of one per cent., etc.   The Legislature has given
the county the power to do this, and made it the duty of the county
officers to do it; and with the understanding and on the agreement
that the county would do it, these bonds were taken and the old
evidences of indebtedness surrendered.   This act is no cession or
surrender of the taxing power, but it is an agreement and authority
to this extent, to exercise the taxing power for a particular pur-
pose.   If the State should stipulate, on full consideration, that she
will make grants for ferries or bridges, or of parts of the swamp
land, on certain terms to certain persons, though the contract could
not be specifically enforced against her—she not being subject to
suit—no one doubts she would be as much bound in all moral
aspects as if she had made the grants, the terms and conditions
having been performed.   But here the county and county officers
*are* liable ; the Legislature charged them, by public law, with cer-
tain specified duties to be performed in the execution of a certain
contract, which the county had a right to make, and did make ;
those duties entered into and became a part of the contract, and
they may be enforced by law.   If this money were collected and
in the treasury, the claim of the creditors would be perfect to have
it applied in pursuance of the contract; and we cannot see why an
executory agreement to collect it does not stand on the same ele-
vated ground.

The truth is apparent, that a refusal to comply with this contract,
made under the imposing sanctions of a public law, would be noth-
ing less than an act of open and undissembled repudiation of an
honest debt, to pay which the honor of the county is solemnly

pledged; and this without even the equivocal apology sometimes made for such delinquency—that of asserted fraud, or defective authority, or want of consideration for the promise. We are not disposed to countenance such a plea, for it is equally opposed to law and to a just regard for the character of the county and State, and to the dictates of justice and common honesty; and we are convinced that, however calamities from physical or other causes have embarrassed her, that county neither desires, nor could derive benefit, by a relief from pressing liabilities, whether improvidently incurred or not, if such relief were procured at the expense of her honor and reputation. This defense is made, doubtless, because the officers of the county felt bound, in prudence, to act only in obedience to the adjudged requirements of law, and not to act at all in levying the tax until the question of their duty to do so and of its effect was definitely settled.

We adhere to our former opinion, that the Act of 1854 having been executed is a contract, and inviolable, and that the county authorities are bound to obey its provisions.

Judgment reversed, and cause remanded for judgment in pursuance of the principles of this and the former opinion.