## No. 7907.

### LUCAS E. MOORE VS. CITY OF NEW ORLEANS ET AL.

AND

### STATE EX REL. LUCAS E. MOORE VS. CITY OF NEW ORLEANS ET AL.

1st. Act No. 31 of 1876, commonly known as the "Premium-Bond Law," did not establish a gambling or lottery scheme, in violation of the exclusive privileges of the Louisiana Lottery Company; and now prohibited by Art. 167 of the Constitution of 1879.

2nd. Said Act No. 31 of 1876 is not unconstitutional as a "reference" law, under Articles 115 and 116 of the Constitution of 1868. These Articles commented upon.

3d. Said Act No. 31 of 1876 does not violate the Constitutional Amendment of 1871, forbidding the increase of the debt of the City of New Orleans.

4th. Said Act No. 31 of 1876 does not impair the obligations of antecedent contracts and bonds of the City of New Orleans, and is not, on that score, unconstitutional.

Municipal Charters are not contracts within the sense of the Constitutional provisions prohibiting the impairing of the obligation of contracts. The Legislature retains full authority to amend such Charters, and to enlarge or diminish the powers granted thereby.

Legislatures cannot trammel the powers of their successors by passing *irrepealable* laws.

The proposition that, because a Legislature, in framing the Charter of a municipal corporation, has authorized the creation of a certain debt, and has provided means for securing the payment of principal and interest thereof, it can, in the same act, destroy the power of future Legislatures to extend the powers of the corporation so as to enable it to contract other debts and provide for their payment, is utterly untenable.

The powers of municipal government are simply a delegation of the powers of State government; and both are, in the same manner and to the same extent, subjects of legislative control and discretion.

The seventh section of said Act No. 31 of 1876, prohibiting the levy of any tax to pay interest on any other bond than the "Premium Bonds," and repealing all laws which directed the levy of taxes for such purpose, is palpably and baldly unconstitutional.

But nothing is better settled than that the unconstitutionality of part of a statute does not necessarily invalidate the whole. The same statute, and even the same section of a statute, may contain unconstitutional provisions and also salutary and useful provisions, not obnoxious to any constitutional exceptions.

Test of constitutionality of the law in such cases.

The doctrine of estoppel is unquestionably subject to important restraints and qualifications in its application to public corporations; but such juridical persons are not emancipated: from those great duties imposed by the law of natural justice and honesty.

A law unconstitutional because it impairs the obligation of contracts, is only null so far as the rights of those persons are concerned, the obligations of whose contracts are thereby impaired. As to all other rights and all other persons, it is entitled to full force and effect.

There are cases in which a law, though unconstitutional, must be sustained, because the party who makes objection, has, by prior action, precluded himself from being heard against it.

The principle is now well settled, that bonds issued by municipal corporations, in pursuance of legislative authority, and negotiable in form, have the qualities and incidents of negotiability, and that in the hands of bona fide holders, they are not subject to equities as to consideration or otherwise.

5th. Article 209 of the Constitution of 1879, which limits the power of municipal taxation to ten mills on the dollar, cannot affect the rights of antecedent contract creditors of the City of New Orleans. They are protected by the Constitution of the United States, which forbids the States to pass laws impairing the obligation of contracts.

Relator, as holder of "Premium Bonds" of New Orleans, is entitled to the Writ of Mandamus to compel the City officers to perform their ministerial duty in levying, collecting and applying the special tax of five mills on the dollar, as provided for by Act No. 31 of 1876.

APPEAL from the Fifth District Court, parish of Orleans. *Rogers,. J.*

Kelly & Lazarus and Thomas & Lewis for the Relator, Appellee:

First—When the Legislature of a State authorizes a municipal corporation to contract a debt, that authorization carries with it by necessary implication the power to provide for the payment or redemption thereof, by the levy and collection of a sufficient tax, unless the contrary expressly appears. 1 Hughes, 484; 20 Wall. 660; 111 Mass. 460; 43 Pa. St. 290; 98 U. S. 381.

Second—Where a statute has authorized a municipal corporation to issue bonds and to exercise the power of local taxation in order to pay them, and persons have given value for bonds issued accordingly, the power of taxation thus given is a contract within the meaning of the Constitution of the United States, and can not be withdrawn until the contract is satisfied. The State and the corporation in such case are equally bound.

Third—That a subsequently-passed statute which repeals or restricts the power of taxation so previously given is, in so far as it affects

728      SUPREME COURT OF LOUISIANA,

*Moore vs. City of New Orleans et al.*

bonds acquired and held under the circumstances mentioned, a nullity.

Fourth—That it is the duty of the corporation to impose and collect the taxes in all respects as if the second statute had not been passed.

Fifth—That if it does not perform this duty, a *mandamus* will lie to compel it. 1 Hughes, 284; 24 How. 376; 4 Wall. 535; 7 Wall. 313; 6 Wall. 166–514; 9 Wall. 415.

Sixth—That the Constitution of a State is a law within the meaning of the obligation clause of the Constitution of the United States, and that a State can no more impair the obligation of contracts by constitutional than by ordinary statutory enactment. 92 U. S. 631; 96 U. S. 595; 22 Grattan, 264.

Seventh—That article 209 of the Constitution of the State of Louisana of 1879, and Act No. 78 of its Legislature of 1880, limiting the power of municipal taxation for all purposes to ten mills on the dollar, are null and void, as against the holders of the bonds of the city of New Orleans, issued by it, for valid and sufficient consideration, under the provisions of Act No. 31 of 1876, the provisions of said act empowering the city, within the limit of fifteen mills on the dollar, to levy a sufficient tax to meet the obligation of its contract with the holders of its said bonds being an essential element of said contract, which is impaired by said article 209 and Act 78.

Eighth—Where a statute has been passed by the Legislature, under all the forms and sanctions requisite to the making of laws, some part of which is not within the competency of the legislative power, or is repugnant to any provision of the Constitution, such part thereof will be adjudged void and of no avail, while all other parts of the act, not obnoxious to the same objection, will be held valid and have the force of law. Sedgwick, Sta. and Const. Law, p. 413; 9 Wheat. 240; 11 Peters, 142; 12 An. 306.

Ninth—Only so much of the Act No. 31 of 1876 as impairs the obligation of antecedent contracts is void; so much of it as relates to subsequent contracts made under the act is valid and binding upon the city.

Tenth—The doctrine of estoppel *in pais* or by conduct is applicable to municipal corporations as well as to private corporations and citizens. 22 Wall. 368; 19 Wall. 666; 24 Ia. 287; 99 U. S. 86; 28 An. 402.

Eleventh—Nobody ought to be estopped from saying the truth or asserting a just demand, unless by his acts or words or neglect his now averring the truth or asserting the demand would work some wrong to some other person who has been induced to do something

NEW ORLEANS, MAY, 1880.                         729

Moore vs. City of New Orleans et al.

or to abstain from doing something by reason of what he had said or done or omitted to say or do.

Twelfth—A corporation, quite as much as an individual, is held to a careful adherence to truth in its dealings with mankind ; and cannot by its representations or silence involve others in onerous engagements, and then defeat the calculations and claims its own conduct has superinduced.

Thirteenth—It appearing from the return made by the city of New Orleans to the alternative writ of mandamus in this case by the said city, and the accompanying exhibits, that the city authorities adopted certain ordinances establishing a certain financial scheme for the refunding of its outstanding bonded indebtedness into certain bonds known as Premium Bonds, on certain terms and conditions, provided in the ordinances, and having subsequently procured the enactment by the Legislature of Louisiana of an act, No. 31 of 1876, ratifying said ordinances ; and having under the provisions of said act and said ordinances, by repeated representations and persuasions, induced certain of the holders of its antecedent bonded indebtedness to refund them into Premium Bonds, and having coerced certain other holders of such antecedent bonds into accepting the terms of said Premium-Bond Act by persistently refusing for years to make any payment to the holders of its old securities on account of either matured interest or principal, except when compelled so to do at the end of the law, and the city having through persuasion or coercion induced the holders of its antecedent bonds to surrender them to be canceled in exchange for Premium Bonds to the amount of $13,060,940, and the city having made no offer of restitution, it is estopped by its conduct from questioning the constitutionality of said act 31 of 1876, or the validity of its bonds issued under said act.

Spencer & White on the same side :

First—The city of New Orleans has no right to plead the unconstitutionality of the Premium-Bond Act:

1. Because she has accepted and acted under it, and induced others to do so.   Cooley, Con. Lim. p. 181,

2. Because she has no interest in doing so.   Cooley, p. 163.

Second—The constitutionality of the seventh section of said act is not involved in this case, because no one is seeking its enforcement or claiming rights under it.

Third—If that section be unconstitutional, the remainder of the act is a complete and perfect plan for refunding the city debt, and entirely

susceptible of execution with section seven expunged. Cooley, p. 177, 178.

Fourth—A Legislature cannot abdicate or abridge the sovereign power of the State to create debts and levy taxes ; nor can it impose restrictions in that regard upon its successors. New Orleans vs. McComb, 2 Otto, 535 ; Cooley, p. 283.

The restrictions put by the 37th section of act 71 of 1852 upon the power of the city of New Orleans to create debts and levy taxes by authority of the Legislature do not operate or constitute a contract which prevents the State from repealing them, and authorizing other modes of creating debts, etc. Cooley, p. 125.

Fifth—A legislative act cannot be declared void because its objects and purposes are deemed immoral or contrary to public policy. It is only when it violates some provision of the Constitution that its immorality can be declared. Cooley, pp. 164, 169.

Sixth—The Premium-Bond Act is at one and the same time a *law* and a *contract*. Its cause, object, and purpose are therefore of necessity lawful, unless prohibited by the Constitution. The Legislature (within constitutional bounds) can make *any act—any purpose* whatever— *lawful*. It decides in the last resort on earth, what is moral and what is public policy. The provisions of the Civil Code or common law, as to the lawfulness of the cause and purpose of contracts, must yield to a subsequent legislative act, specially authorizing or legalizing any act or contract.

Seventh—If the conditions prescribed in section 37 of Act 71 of 1852 be not repealed by the subsequent acts authorizing the city to issue bonds, and be held to make part of those acts, as laws *in pari materiae*, still, *quoad* innocent third holders, all those conditions are conclusively presumed to have been complied with. 97 U. S. p. 96.

Eighth—Where an act authorizes a thing to be done for the benefit of a third person, it becomes mandatory when that third person accepts; and the courts will enforce its performance.

Leovy & Kruttschnitt and H. C. Miller on the same side, for the Sun Mutual Insurance Company. (This case, by consent of counsel, was argued together with that of Lucas E. Moore.—Reporter).

First—Injunction will lie to prevent the undoing of that which, if it be undone, would immediately entitle plaintiff to a writ of mandamus to have done again. 98 U. S. 397 ; 34 How. 376.

Second—The bonds of the city of New Orleans commonly known as the Premium Bonds are legal and valid obligations of said city independently of the sanction given to them by Act 31 of 1876. The issue of those bonds in exchange for outstanding valid bonds of the city

of New Orleans was authorized by the general powers conferred
upon the Council, by its duties to the city creditors, and by the
constitutional amendment of 1874.

Third—The issue of those bonds did not constitute an increase of the
city debt, nor is the Premium-Bond scheme a lottery within the
meaning of the laws of the State prohibiting lotteries.

Fourth—If the city of New Orleans did not have the power to issue the
bonds in question without special legislative sanction, that sanction
has been given by Act 31 of 1876.    Dillon, Mun. Cor. ? 424 ; 9 Will.
485 ; 3 Wall. 327 ; 16 Wall. 664 ; 2 Rob. 209.

Fifth—The Legislature may ratify whatever it could originally authorize.

Sixth—Even if that act be invalid in part, still the illegal portion is
easily separated from the legal, and the Court will enforce the legal
portion.    The sections whose illegality is maintained are not mate-
rial to the present litigation, and may be stricken from the act and
yet not affect plaintiff's right to the relief sought.

Seventh—The Premium-Bond scheme does not violate article 115 of the
Constitution of 1868.

Thos. J. Semmes and E. H. McCaleb, City Attorney, for Defendants
and Appellants :

I.

The Premium-Bond Act No. 31 of 1876 constituted a contract between
the State, the City, and the bondholders, and its provisions as such
are an *entirety ;* the illegality of one portion of the contract affects
the whole.
Von Hoffman vs. Quincy, 4 Wallace, 554.
Second Municipality vs. Morgan, 1 Annual, 111.

II.

The Premium-Bond Act contains an agreement, that a tax of one. and
one half per cent, and no more, shall be levied in this city for all
purposes, that ten mills thereof shall be appropriated to the sup-
port of the City Government, and the remaining five mills to the
extinction, principal and interest, of Premium Bonds, and that no
other tax shall be levied and no other bond provided for, and the
taxpayers as well as Premium-Bond holders are expressly authorized
to prevent the collection of any other tax.

Such an agreement is a fraud on other creditors—violates the public
policy of the Constitution of the State and of the United States,
which forbids the enactment of laws impairing the obligation of
contracts ; the making of an agreement in the face of that policy is
the doing of an act forbidden by law, and therefore void.    The ob-
ject and intention of the agreement is to coerce creditors to accept

732        SUPREME COURT OF LOUISIANA,

Moore vs. City of New Orleans et al.  .

the terms of the Premium-Bond Act, and to receive in settlement of their claims a bond payable in fifty years ; any earlier payment depends on chance in the drawing of lots, and the inducement to accept the terms was the chance of drawing a prize in a lottery, in addition to the right to payment of the principal and interest of the bond.

Nicholson vs. Leavitt, 10 N. Y. 593.

Craig vs. State of Missouri, 4 Peters, 410.

Graves vs. Roy, 13 La. 457 ; 4 Ala. 374.

Riculfi vs. De La Croix, 7 A. 720.

Blacklock vs. Dobie, 1 Common Pleas Div. 265 ; 6 R. 115 ; 1 A. 178.

Begbie vs. Phosphate Co., 1 Queen's Bench Div. 679 ; 10 Queen's Bench (Law Rep.), 491 ; 2 Wheat. 148.

Harbor vs. DePolos, 28 Ohio St. 251.

Guernsey vs. Cook, 120 Mass. 501.

McGregor vs. Railway Co., 18 Ad. and Ell., N. S. (83 E. C. L.) 630.

Insurance Company vs. Morse, 20 Wall. 458.

Orleans Navigation Company vs. State Bank, 3 A. 318.

Where a corporation is engaged in an illegal attempt, all who contract with it, knowing its object, and to aid that object, do so under the penalty of having their contracts declared void.

Clancy vs. Orange Company, 62 Barb. 395.

### III.

An agreement, void because it violates public policy, cannot be ratified or confirmed by the most solemn engagements, and, therefore, judicial admissions, or any other form of estoppel, have no influence on the case.

Coppel vs. Hall, 7 Wall. 542.

Loan Association vs. Topeka, 20 Wall. 655.

Orleans Navigation Co. vs. State Bank, 3 A. 308.

So an *ultra vires* contract.   Roy's case, 19 Wall. 468 ; 28 A. 343 ; 12 A. 688 ; Dillon on Municipal Corporations, § 381.

### IV.

Under the *régime* of the civil law, municipal corporations are entitled to *jura minorum*, and minors are never estopped.   16 A. 98 ; Orleans Navigation Co. 3 A. 309 ; Millaudon's case, 1 A. 215 ; Seibrecht vs. N. O., 12 A. 496 ; 3 A. 230 ; 4 A. 181 ; 27 A. 319 ; 12 A. 155 ; 1 0A. 11

### V.

The Premium-Bond Act and plan show that the contract is a lottery, and it is, therefore, against public policy, and prohibited.

Journal du Palais, 1866, p. 911.

Sykes vs. Beadon, 11 Chancery Div. 190.

Constitution of 1879, Art. 167 ;. Act 10 of 1874.

## VI.

The Premium-Bond plan increases the municipal debt $100,000 per an-
num, bestowed as prizes, and, therefore, violates the constitutional
amendment of 1874, which forbids any increase of the city debt ;
said amendment only authorizes the *renewal* of *matured* bonds, or
an exchange of unmatured bonds similar in kind to those outstand-
ing. 23 A. 402 ; 25 A. 344 ; 27 A. 40.

## VII.

The Premium-Bond Act is *retroactive*, and cannot give validity to illegal
ordinances already passed.

2 Kansas, 134 ; 13 Wisconsin, 38 ; Sedgwick, Cons't Limitation, pp.
160 and 346.

## VIII.

The Premium-Bond Act is void, because it cannot by reference adopt
ordinances which by reference adopt a scheme of debt.

Constitution, Art. 115 of 1868.

4 A. 297 ; 11 A. 56 ; 10 A. 721.

C. E. Schmidt, *Amicus Curiæ*, for Defendants and Appellants :

1. The people of a State may, by their Constitution, limit the power of
taxation.

2. The objection that the limitation in the Constitution of 1879 is vio-
lative of art. 1, sec. 10, of the Federal Constitution, on the alleged
ground that it impairs the obligation of a contract, cannot be main-
tained, because the Act No. 31 of the session of 1876 is unconstitu-
tional, and therefore null and void.

3. That act violates the provisions of articles 115 and 116 of the State
Constitution of 1868, inasmuch as it simply adopts, without in any
manner explaining it, a complicated plan of adjustment of the city
debt, and this by a simple reference to two municipal ordinances,
which themselves merely refer, without reciting its contents, to a
document submitted by the Administrator of Finance.

4. The Act 31 of 1876 is clearly violative of art. 110 of the State Con-
stitution of 1868, and of art. 1, sec. 10, of the Constitution of the
United States ; for its object is to compel the creditors of the city
to exchange the bonds they hold for what are called Premium Bonds,
a character of obligations of an entirely different nature from that
which they hold, payable at an uncertain instead of a certain date,
and bearing a different rate of interest; and it forbids the payment
of either principal or interest of any bond not so exchanged and
converted.

5. The Act 31 of 1876 being unconstitutional, and therefore void, con-

ferred no power on the corporation to issue the bonds or to levy any tax for their payment.

6. Even if the bonds held by the plaintiff were in form negotiable bonds, the city, being without authority to issue them, is not estopped by the resolutions of the Municipal Council, or the acts of its officers, from denying the authority of those officers to issue the bonds.

7. The *bona fides* of the plaintiff cannot protect him against the plea of want of power of the corporation to issue the bonds.

8. The so-called bonds held by the plaintiff are wanting in the essential characteristics of negotiable municipal bonds, being for uncertain and variable sums, and payable at no fixed time, and such want of negotiability would alone prevent the plaintiff from claiming that he is protected from any inquiry into the regularity of their issue.

B. R. Forman, on the same side, for certain owners of real estate and consolidated bonds.

---

The opinion of the Court was delivered by

FENNER, J. The above two cases are presented to us in one record, and to be decided together.

The issues will be stated as briefly as possible :

Lucas E. Moore, plaintiff in one and relator in the other case, substantially avers that he is the owner of certain bonds of the city of New Orleans (commonly known as Premium Bonds) issued under the provisions of an act of the Legislature of the State, being Act No. 31 of 1876, and of certain ordinances of the city of New Orleans referred to in said act ; that by the provisions of said act it is made the duty of the City Council, in the month of December of each year, in its budget annually adopted for the ensuing year, to include an amount sufficient to pay interest, principal, and premiums accruing annually under the operation of the act for the redemption of said bonds, and to levy a tax sufficient to provide the amount included in the budget as aforesaid, and to place the proceeds of said tax to the credit of an account to be called the Premium-Bond Account, to be used for no other purpose than the payment of said bonds, interest, and premiums ; and that by the provisions of said act the Council is further required to levy annually a tax of at least one half of one per cent for the purpose aforesaid.

He further avers that, on the 24th of December, 1879, the Council adopted its annual budget for the year 1880, and included therein an estimate and appropriation of three hundred thousand dollars for interest and redemption of the Premium Bonds, and on the same day adopted an ordinance levying a tax of fifteen mills on the dollar, of which five mills were for the purpose contemplated in the legislative act aforesaid.

He further avers that under the pretended authority of an act of the Legislature, No. 78 of 1880, and of article 209 of the Constitution of 1879, the City Council was about to repeal the ordinances above mentioned, and to adopt other ordinances limiting the tax to be levied to ten mills on the dollar, and requiring the entire revenue derived therefrom to be applied to current governmental expenses, and making no provision whatever for the Premium Bonds ; that such ordinances had actually been passed by the Council, but had not, as yet, received the signature of the Mayor.

He alleges sundry other acts and purposes of the City Council in contravention of the duties imposed by the act of 1876 and of the rights of holders of Premium Bonds.

He avers that the provisions of the Act No. 31 of 1876 constitute a valid contract between the city of New Orleans and the holders of Premium Bonds, and that the duties therein imposed on the city, and the taxation therein directed, are elements of said contract ; that article 209 of the Constitution of 1879 and Act No. 78 of 1880 cannot operate to impair the obligations of said contract, and that so far as they do so operate, and to the extent of such operation, as against the holders of said bonds, they are null and void, because of their repugnancy to section ten, article one, of the Constitution of the United States.

The petitions contain other appropriate allegations, and pray for writs of injunction and mandamus restraining the city from acts inconsistent with their duties under act 31 of 1876, and commanding them to perform and carry out said duties ; and for decrees recognizing the validity of the contract between the city and the Premium-Bond holders under the act 31 of 1876 ; declaring that the duties imposed on the city and the taxation directed by said act are essential elements of said contracts ; that in so far as article 209 of the Constitution of 1879 and act 78 of 1880 operate, or are intended to operate, to disable or prevent the city from complying with any of the obligations of said contract, they are null and void ; and, finally, that the writs of injunction and mandamus be made peremptory and perpetual.

The city does not dispute any of the allegations of fact set up in the petitions, and, indeed, the parties entered into a complete statement of facts.

The defense of the city rests purely upon questions of law, which may be summarized as follows :

First. That Act No. 31 of 1876 establishes a gambling or lottery scheme, in violation of exclusive privileges of the Louisiana Lottery Company, and now prohibited by article 167 of the Constitution of 1879.

Second. That said act is void as a "reference" law under articles 115 and 116 of Constitution of 1868.

Third.    That it violates the constitutional amendment of 1874, forbidding the increase of the debt of the city of New Orleans.

Fourth.    That said act is unconstitutional and void, because it was intended to impair, and does impair, the obligation of contracts made prior to its' enactment and to divest all remedies therein against the city, and was passed with the unlawful purpose of creating preferences in favor of certain creditors, and of coercing the acceptance of said act by the city's creditors.

Fifth.    Although not set up by the city in her pleadings, it has been contended in argument by *amici curiæ* appearing in support of the defense, that the article 209 of the Constitution of 1879, limiting the rate of municipal taxation to ten mills, must have effect as against all persons and all rights.

We shall discuss these several questions of law in the order named :

## I.

It is urged that the act 31 of 1876 is void for violation of the exclusive privileges of the Louisiana Lottery Company.    It has just been decided by the Supreme Court of the United States that such exclusive privileges are revocable at the will of the Legislature; and, moreover, under the Constitution of 1879, they are voluntarily relinquished and no longer exist.

But it is further said that the allotment feature of the act is abrogated by the article 167 of the Constitution of 1879.

There is nothing in the objection, and it is not necessary to say more in answer thereto than that we do not regard the act 31 of 1876 as granting any lottery charter or privilege within the meaning of the Constitution ; and, even if it did, the article referred to would not operate to revoke it.    It only regulates future grants of such lottery charters or privileges.

## II.

It is contended the act is void for repugnancy to articles 115 and 116 of the Constitution of 1868.    Article 115 provides that "no law shall be revived or amended by reference to its title, but in such case the review or amended section shall be re-enacted and published at length."

This has no application to this act, which does not amend any preexisting law, or revive any repealed law.

Article 116 provides that " the General Assembly shall never adopt any system or code of laws by general reference to such system or code of laws ; but in all cases shall specify the several provisions of the law it may enact."    This article is peculiar to Louisiana Constitutions, and has been handed down from the Constitution of 1812 through every Constitution which the State has ever had.    Its origin, object, and meaning

are explained by Chief Justice Eustis, in his opinion in Succession of Franklin, 7 A. 418, who says : "At the commencement of the dominion of the United States in Louisiana, some of the lawyers from the old States were disposed to introduce here the system of laws with which they were familiar. Efforts were not spared to introduce the common law, as it has been since introduced and prevails in other States whose territory formerly belonged to France and Spain. But of the members of the bar conversant with the common law, the most eminent did not favor its introduction as a general system, and the consequent exclusion of the civil law. The views of these distinguished men, reflecting the evident sense of the people, were impressed on the legislation of the State. The subject was deemed of such moment that it was not trusted to ordinary legislation ; and hence the provisions, in both the Constitutions of 1812 and 1845, which prohibited the introduction of any system of laws by general reference."

It is manifest that the act here in question does not adopt any "system or code of laws" within the meaning of this article. The last phrase of the article, which reads : "but in all cases shall specify the several provisions of the law it may enact," is directly connected with the previous principal provision, and the words "in all cases" evidently mean "in all *such* cases," *i. e.* where a "system or code of laws" is adopted. To treat it as an independent provision, declaring as a general proposition that "in all cases the General Assembly shall specify the several provisions of the law which it may enact," without explanation as to what it means by "specifying," would make it meaningless and absurd. Taken in connection with the context of the article, it is apt, appropriate, and unambiguous.

III.

It is urged that the act violates the provisions of the constitutional amendment of 1874, limiting the debt of the city of New Orleans by increasing the debt $100,000 *per annum* in gratuitous premiums.

A simple arithmetical calculation will show that the amount of interest and premiums together to be paid annually under the Premium-Bond scheme is far less than the interest alone which would have been due on the bonds which were surrendered in exchange for Premium Bonds. The debt of the city, therefore, is not increased, and the constitutional amendment is not violated.

IV.

In discussing the *fourth* ground of objection touching the impairment of the obligation of antecedent contracts, the destruction of remedies thereon, and the unlawful preferences created in favor of certain creditors over others, it is necessary that we should make some references to anterior legislation concerning the indebtedness of the city

of New Orleans, in order that we may understand the condition of affairs existing at the time of the adoption of the Premium-Bond plan. And we begin with the famous thirty-seventh section of the act of 1852, which is regarded by many as an avenue of escape from the burden of the subsequent indebtedness of the city.

The 37th section of the act of 1852 is unquestionably a contract, so far as it imposes upon the city of New Orleans liability for the payment of the principal and interest of the consolidated bonds.

So far as the special provision made therein for taxation to pay the principal and interest of said bonds is concerned, that, also, is unquestionably a contract, *provided* the taxation directed therein is *constitutional*. This question has been ruled by this Court adversely to its constitutionality ; but the case is pending on appeal in the Supreme Court of the United States ; and it is neither necessary nor appropriate for us to pass upon the question in this case.

The remaining provisions of the section, (1st) declaring null all ordinances, acts, etc. of the Council in any year, unless the ordinance imposing the consolidation-loan tax shall have been previously passed ; (2d) forbidding the city to issue any obligation or evidence of debts other than the consolidated bonds ; (3d) forbidding the contracting of any loan, unless authorized by a vote of the people ; (4th) declaring null any ordinance creating a debt or loan, without providing ways and means for their payment in principal and interest, are obviously intended as mere legislative restraints upon the powers of the corporation. Provisions of this nature, more or less stringent, are appropriate and common in all municipal charters.

Such charters are not contracts within the sense of the constitutional provisions prohibiting the impairing of the obligations of contracts.

Cooley on Const. Lim. 193.

" The Legislature retains full powers to amend such charters, and to enlarge or diminish the powers granted thereby." *Id.* 192, 276.

" Restraints on the legislative power of control must be found in the Constitution of the State, or they must rest alone in the legislative discretion." *Id.* 193.

"Legislatures cannot trammel the powers of their successors by passing *irrepealable* laws." *Id.* 125, *et seq.*

" The framers of the Constitution did not intend to restrain the States in the regulation of their civil institutions adopted for internal government." Dartm. Col. case, 4 Wh. 629.

" They may, therefore, discontinue offices and abolish or change the organization of municipal corporations at any time, according to the existing legislative review of State policy." Cooley, 276.

The proposition, that because a Legislature, in framing the charter of a municipal corporation, has authorized the creation of a certain debt, and has provided means for securing the payment of principal and interest thereof, it can, in the same act, destroy the power of future Legislatures to extend the powers of the corporation so as to enable it to contract other debts and provide for their payments, is utterly untenable. The effect would be to enable a Legislature to pass irrepealable laws, to impose restraints upon future legislative power not found in the Constitution, and to barter away the legislative right and power to regulate the civil institutions of the State, and to contract and direct their administration in accordance with the exigencies of the times.

But for the existence in the charter of 1852 of the provisions for the creation and payment of the consolidated bonds, no one would have questioned the right of future Legislatures to alter, diminish, or enlarge the powers of the corporation. We cannot admit that the mere concurrence of such provisions has the effect to make all or any of the other provisions of the charter irrepealable, unless, by such repeal, the obligation of those bonds is impaired, or the provisions directed for their redemption are taken away. There is a notable absence, in the act of 1852, of any declaration that these provisions under discussion form part of the contract with the bondholders ; and while we think even such a declaration would have been inoperative, its absence serves to weaken the supposition that such was even the *intention* of the Legislature.

The decision in Smith vs. Appleton, 19 Wisconsin, 495, is certainly adverse to the views here expressed. We cannot recognize its authority. It is extremely brief and dogmatical. It does not discuss, or dispose of, any of the patent objections suggested by the very statement of its doctrine. The authorities referred to give it not the slightest support.

The California cases referred to (7 Cal. 579, and 10 Cal. 563), are cases where, in the act providing for the funding of the indebtedness of the city of San Francisco, it was provided that a tax should be assessed and collected annually, sufficient in amount to pay the interest on the funded debt, and in addition thereto, to furnish a sum of $50,000 as a sinking fund for the ultimate redemption of the bonds ; this tax to be assessed and collected by the taxing officers of the city upon a written statement of the amount necessary to be furnished by a Board of Commissioners of the funded debt established by the act, to whom, after collection, the proceeds of the tax were to be paid over for the purposes specified. The amount was assessed and collected, and the part thereof attributable to the interest of the bonds was paid over to the Commissioners ; but the Treasurer refused to pay over the amount of $50,000 due to the sinking fund, on the ground that, by a subsequent act of the

Legislature, it had been otherwise appropriated and diverted to a different purpose. The Court, after holding that the funding-law was a contract, said: "The effect of the later act would be to withdraw from the hands of the Commissioners of the funded debt a large amount of money, which they are authorized to loan for the benefit of the bond-holders, and the direct consequence is to diminish the fund out of which they are entitled to be paid. Such legislation is obnoxious to that provision of the State and Federal Constitutions which forbids the Legislature from passing laws impairing the obligation of contracts."

No one can question the correctness of these decisions, but, evidently, they do not touch the questions involved in the case of Smith vs. Appleton.

The only later case to which we are referred by counsel for defendant is Mayor vs. Magruder, 34 Md. 384; but this case also rests upon an entirely different principle. It involved no question of contract or of constitution at all. The charter of the city of Cumberland prohibited the issue of bonds for any sum exceeding $10,000 without the previous assent of a majority of its legal voters. A subsequent law was passed authorizing the building of a bridge and the issuing of bonds in payment. The city entered into contracts for building the bridge, and was about to issue bonds exceeding $10,000, without the previous popular assent, when it was enjoined by taxpayers. The Court said: "There is nothing on the face of the law, or in the nature and character of the work to be done, from which an inference can be drawn that the Legislature supposed it would cost a sum exceeding $10,000, or, if it did, that the sanction of the citizens should not be first obtained. On the contrary, the failure to name or limit any sum for which bonds might be issued  *  *  *  may well warrant the assumption that the Legislature intended that if a site was fixed upon and contracts made involving an expenditure beyond $10,000, the provision of the charter should be observed by submitting the question to a vote of the citizens." It is clear the Court here is interpreting merely the *intention,* and not the *power* of the Legislature, and it is, therefore, inapplicable.

We consider Smith vs. Appleton as standing alone and entirely unsupported.

On the contrary, the Supreme Court of the United States, in Amey vs. Mayor, 24 How. 373, held that a legislative limitation upon the powers of a corporation to issue bonds was operative only on the power of the city, and not on the power of the Legislature. In the case of Board of Liquidators vs. McComb, 2 Otto, 535, the same Court said: "We are not prepared to say that the Legislature *can* bind itself without the aid of a constitutional provision, not to create further debt, or not to issue any more bonds. Such an engagement could hardly be enforced

NEW ORLEANS, MAY, 1880. 741

Moore vs. City of New Orleans et al.

against an individual; and when made on the part of the State, it involves, if binding, a surrender of a prerogative which might seriously affect the public safety."

The powers of municipal government are simply a delegation of the powers of State government; and both are, in the same manner, and the same extent, subjects of legislative control and discretion.

Finally, in the case of Southern Bank vs. Pilsbury, 31 An. 16, the late Supreme Court has fully discussed this very 37th section of the act of 1852, and has distinctly held these limitations not to constitute part of the contract, and not to be irrepealable.

Our first conclusion, therefore, is that the Legislature retained the right to authorize the city of New Orleans to create new debts and issue new bonds, notwithstanding the 37th section, provided only it did not affect the validity of the consolidated bonds, or interfere with the duty of the city to levy the tax there directed, if constitutional.

Now, all the bonds in existence at the date of the adoption of the Premium-Bond plan, were issued under the authority of special acts of the Legislature, which did not, in any manner, attack the consolidated bonds or interfere with the levy of the tax directed for their protection.

We have examined with care the acts of 1854, 1868-9-70-1 and 2, and find nothing in them derogatory to the rights of consolidated bondholders.

We can conceive of no other grounds upon which the city of New Orleans could successfully remit the payment of these bonds.

No doubt, they represent the results of great extravagance and fraud; so, doubtless, did the consolidated bonds; so do the bonds of the State; so do the bonds of the United States; so, to greater or less extent, do the bonds of every government and of every corporation; but, under the decisions of the Supreme Court of the United States, those questions have passed beyond the reach of investigation. Such bonds, issued in pursuance of legitimate authority, negotiable in form, and in the hands of *bona fide* holders, cannot be questioned as to their consideration.

Thus, in 1875, the city of New Orleans owed about $22,000,000 in bonds, the validity of which she could not successfully question.

Under the constitutional amendment of 1874, she had the right expressly reserved to her of issuing "*new bonds in exchange for other bonds*, provided the city debt be not thereby increased."

When, therefore, in 1875, she passed her ordinances Nos. 3130, 3140, 3233, adopting and providing for the carrying out of the Premium-Bond plan, she did that only, which, without express legislative authority, she had a right to do. Those ordinances contained nothing derogatory to the rights of the consolidated bondholders. They merely *invited* the

48

exchange of old bonds for new bonds, and contained nothing minatory to those who did not desire to do so. They certainly did not thereby increase the debt of the city. If the legislative act of 1876 had never been passed at all, we think the holders of Premium Bonds issued under these ordinances would have been holders, for valuable consideration, of perfectly valid obligations of the city.

Prior to the exchange, the city had the right, and it was her legal duty, to levy and collect a sufficient tax to pay the interest on her bonded debt; and after the exchange, it would have been her legal duty to exercise the same taxation to an extent sufficient to carry out the contract under which the exchange had been effected.

It was thought, however, desirable to procure express legislative sanction for the plan adopted. Accordingly, the act of 1876, known as the Premium-Bond Act, was passed.

It ratified and confirmed the action of the City Council; it authorized and directed the exchange of bonds in accordance therewith; it made sundry appropriate regulations for the administration of the scheme; it directed and required the levying of a specific tax not exceeding five mills on the dollar for the purpose of paying the principal and interest maturing annually under the scheme. Thus far it certainly contains nothing obnoxious to censure.

Thus much the Legislature had clearly a right to do—thus much it evidently intended to do; and by the plain terms of the law, it did actually do. But, proceeding further, it embodied in the *seventh* section of the act a provision prohibiting the levy of any tax whatever to pay interest on any other bonds except the Premium Bonds, and repealing all laws authorizing or directing the levy of any tax for such purpose. This provision, and all others in the act of like character, were palpably and baldly unconstitutional. By reason of these provisions, we are asked to declare the whole statute unconstitutional and void.

Nothing is better settled than that the unconstitutionality of part of a statute does not necessarily invalidate the whole. The same statute, and even the same section of a statute, may contain some unconstitutional provisions, and may contain other salutary and useful provisions not obnoxious to any constitutional exception. "To the extent of the collision and repugnancy," said Chief Justice Shaw, "the law of the State must yield; and to that extent and no further it is rendered, by such repugnancy, inoperative and void."

Commonwealth vs. Kimball, 24 Pick. 361.

In treating this principle two tests are commonly applied :

First—If, when the unconstitutional portion is stricken out, that which remains is complete in itself and capable of being executed in

NEW ORLEANS, MAY, 1880. 743

Moore vs. City of New Orleans et al.

accordance with the legislative intent, wholly independent of that which was rejected, it must be sustained.

Cooley, Const. Lim. 178.

Such is evidently the case here. You may strike out the seventh section entirely, and every other phrase in the act directly or indirectly affecting the rights of bondholders who do not exchange for premiums, and there yet remains a consistent and complete statute for the other legitimate purposes of the act.

Second—Examination must be made to determine whether all the provisions are so dependent on each other, and otherwise so connected together in meaning, that it cannot be presumed the Legislature would have passed the one without the other. We cannot think that such a presumption arises here. It cannot be doubted that, even without the unconstitutional provisions referred to, the scheme embodied in the act was one greatly to the advantage of the city of New Orleans and of the taxpayers thereof. We see no reason to suppose that the Legislature would not have passed the act, even had it been fully aware that the obnoxious section could not be enforced.

The application of both these tests, therefore, leaves the constitutional portions of the act entitled to have full force and effect.

The unconstitutional portions are as if not written. In legal contemplation, they are eliminated and eviscerated from the act ; and they are equally eliminated from the *contract* declared in the fifteenth section of the act. The law and the contract remain perfectly legitimate ; confined in their scope and effect to a legislative ratification and authorization of. the Premium-Bond scheme as embodied in the city ordinances, requiring the issuance of Premium Bonds in exchange for all outstanding bonds, the holders of which were willing· to accept the exchange, imposing upon the city the obligation of levying a tax as provided for the exclusive purpose of carrying out this scheme, and leaving the holders of bonds unwilling to accept the exchange to enforce their legal rights as guaranteed by other laws.

But it is said that the provisions of the seventh section formed part of the *consideration* of the contract, and that the elimination thereof destroys so much of the *consideration*. In whose favor was this consideration, and who is entitled to complain of the failure thereof ? Certainly not the city of New Orleans. She had already proposed, and to some extent entered into, her contract prior to the passage of this law and independent of any such provision ; and if she held out this unconstitutional provision, afterward, as an inducement to her creditors to contract, she cannot be heard to complain if they have been deceived. Surely the bondholders who have not accepted have nothing to complain of in the annulment of this provision, which is annulled solely

744          SUPREME COURT OF LOUISIANA,

Moore vs. City of New Orleans et al.

because it invaded their rights. If anybody could complain, it would be the present holders of Premium Bonds, who may have been led into the exchange by this false inducement and vain threat, and who now find that they have been deceived and lose the exclusive rights which they might have fancied would be assured to them. But they do not complain. On the contrary, they stand before the Court admitting the nullity of these stipulations, and waiving all pretense of claim to their enforcement.

An extraordinary attempt is made to convert these Premium-Bond ordinances and law into a conspiracy between the City, the State, and, strange to say, the Premium-Bond holders, for the purpose of defrauding, delaying, and hindering other creditors. If there was such a conspiracy, surely the present holders of Premium Bonds were not parties to it. When it was inaugurated they were holders of other bonds of the city, and the conspiracy, if such existed, was directed as much against their rights as against those of any other creditors. If they have gained any advantage by accepting the terms proposed, the same advantage has always been and still remains open to any other creditor. If, on the contrary, they are victims of the conspiracy, and have lost rights which the other creditors retain, they cannot be justly accused of being authors of a conspiracy against themselves.

The inequitable results of declaring this statute wholly void powerfully reinforce the reluctance with which enlightened courts habitually assume the duty of annulling the acts of a co-ordinate branch of the government.

Under the invitation of this statute, holders of more than $13,000,000 of the bonds of the city have surrendered them in exchange for these Premium Bonds. The city has received them, and has actually canceled them; so that she is incapable of executing a re-exchange, or replacing the parties in the position in which they were.

The doctrine of estoppel is unquestionably subject to some important restraints and qualifications in its application to public corporations ; but such juridical persons are not emancipated from those great duties imposed by the law of nature, recognized in every system of morals and religion, and consecrated in universal jurisprudence, among which those most elementary are the injunctions, *honeste vivere, suum cuique tribuere,* and that no one shall be permitted to enrich himself at the expense of his neighbor. Whatever vice or turpitude, if any, may exist in this law, lies exclusively at the door of the State and City, and it is manifest that the Premium-Bond holders are in no manner responsible for it. The objectionable provisions of the law originated independently of the will of these bondholders, and their submission to the terms dictated did not, in any degree, tend to give greater force and efficacy to the obnoxious portions of the law than they would have had,

if they had refused to submit. The turpitude alleged by the city, if there be any, is exclusively that of the city and State, and not in any degree of these bondholders, who do not claim these provisions as part of their contract, and do not ask their enforcement. They simply ask that the city shall perform those stipulations of her contract with them which are clearly just and lawful, and in consideration of which they have surrendered to her, and she has actually canceled, $13,000,000 of her bonds. It is impossible to conceive of any technical doctrine under which the city, having received and canceled these bonds, in execution of this contract, can be listened to in asking a court of justice to relieve her from performing her correlative obligations, while she retains, does not restore, and does not offer to restore, the immensely valuable consideration which she has received.

The contrary argument and authorities of the ingenious special counsel of the city find complete answer in the fact that the alleged illegalities and violations of prohibitory laws contained in the Premium-Bond Act do not originate in, and are not the subjects of, the contract sought to be enforced. They originated and existed before and entirely independent of the contract with these bondholders. The latter took no part in procuring their passage. They did not derive the least additional force or sanction from the subsequent submission of these bondholders to the exchange proposed. The bondholders are, therefore, entirely innocent of any participation in, or responsibility for, the obnoxious provisions of this statute; and it is only as between partners in guilt that one can be allowed to set up his own turpitude against the other. Against an innocent party, the maxim holds, *nemo suam turpitudinem allegans audiendus est.* And it is equally true that against such innocent party the other party, even to an illegal contract, cannot invoke its nullity as a defense against his obligation, without restoring, or offering to restore, the consideration which he has received. Such an estoppel was enforced by the Supreme Court of the United States.

Pendleton Co. vs. Amy, 13 Wall. 297.

Having reached the conclusion that the contract was valid, we do not find it necessary to discuss further the doctrine of estoppel.

There are, however, other conclusive considerations which disable the city of New Orleans from maintaining this defense of unconstitutionality:

1. A law unconstitutional, because it impairs the obligation of contracts, is only null so far as the rights of those persons are concerned the obligations of whose contracts are thereby impaired. As to all other rights and all other persons, it is entitled to full force and effect.

Mandry vs. Monroe, 1 Mich. 68. Cargill vs. Power, 1 Mich. 369. Baker vs. Braman, 6 Hill, 47.

2. There are cases in which a law, though unconstitutional, must be sustained, because the party who makes objection has, by prior action, precluded himself from being heard against it.

Baker vs. Braman, 6 Hill, 47.

Embury vs. Conner, 3 N. Y. 511.

People vs. Murray, 5 Hill, 468.

3. Only a person having a right and interest to invoke the unconstitutionality of a law, as affecting himself, his property, and his rights, can present such a defense.

Wellington Petr. 16 Pick. 96.

The complaint of the city of New Orleans here is, not that the provisions complained of in this statute invade or destroy any of her rights, but that they seek to relieve her from some of her *obligations*.

The pretense of the city that she represents the interest of the taxpayers, who are her corporators, in this defense, is not reasonable.

We cannot possibly understand how it can be the interest of the taxpayers to destroy the settlement, actually made under this act, of more than two thirds of her bonded debt, the effect of which is greatly to extend the term of payment, to make an enormous reduction in the rate of interest, and to reduce the rate of taxation required to meet the same by nearly one half.

If it be supposed that the annulling of the Premium Bonds could possibly be effected without reviving the bonds for which they were taken in exchange, or at least the obligations thereof, it is a gross delusion, repugnant to every idea of law or justice.

If it be supposed that advantage would be gained by letting in defenses to these former bonds on the grounds of fraudulent consideration and irregularities in their issue, it is apparent that these defenses could and would be submitted to the determination of the Federal tribunals, and no student of Federal jurisprudence can evade the conclusion that such defenses would not receive the slightest consideration.

No principle is better settled than that bonds issued by municipal corporations, in pursuance of legislative authority, and negotiable in form, have the qualities and incidents of negotiability; that the only defense thereto is the want of *power* to issue them; and that, in the hands of *bona fide* holders, they are not subject to equities as to consideration or otherwise.

See numerous cases cited in Dillon on Munic. Corp. §§ 405, 415, 416; Dillon on Mun. Bonds, §§ 5 and 7; Daniell on Nego. Instr. § 1500.

The effect, therefore, would be to plunge the city into profitless litigation, and to transfer the administration of the power of municipal taxation from the city government to the Federal courts. Instead of having the burden of taxation lightened by distribution in every year,

it would accumulate in volume as the years were consumed in litigation, and would then fall upon property with crushing and destructive weight.

The unconstitutional portions of the Premium-Bond Act invade no rights of the city of New Orleans. They attempt to invade the rights of her creditors, and to relieve her from the performance of corresponding duties. This does not give her the right to complain.

## V.

It is contended that article 209 of the Constitution of 1879 and Act No. 78 of 1880 absolutely confine the power of municipal taxation within the limit of ten mills on the dollar, and that even the rights of pre-existing contract creditors must find their satisfaction within that limit.

We have, heretofore, in the recent case of Folsom Bros. vs. City, had occasion to consider the effect of this article of the Constitution ; and we now repeat that the article must have a rigid enforcement with regard to all creditors whose rights are not protected by the Constitution of the United States, and with regard to all future operations of the city government of every kind whatever. But it is perfectly clear that the rights of antecedent contract creditors are protected by the Constitution of the United States, and they are entitled to have them enforced " in all respects as if " this provision of the Constitution " had not been passed."

Von Hoffman vs. City, 4 Wall. 535.

The fact that the act of the State is a constitutional provision instead of a mere legislative act does not affect the case.

R. R. Co. vs. McClure, 10 Wall. 515.

It is apparent, therefore, that whatever percentage of taxation may be required to meet the maturing obligations in interest or principal of antecedent contract creditors, must, in any and all events, be levied.

It is apparent on the face of this record that, but for the adoption of the Premium-Bond plan, the interest on the existing bonded debt of the city would alone have required an annual tax of more than ten mills; and if the result of success in the city's present defense should be to re-instate the surrendered bonds, the same rate of taxation would be again immediately required. Even if the Premium-Bond plan be maintained, this record shows that mandamuses from the Federal Court are in course of actual execution requiring a special tax of more than two mills. We cannot ignore the fact that numerous similar mandamus proceedings are ripening in the courts ; and that the case of the consolidated-bond holders now pending in the United States Supreme Court, if decided in their favor, would immediately necessitate a tax far exceeding ten mills. If, therefore, it shall be assumed to have been the intention of the Constitution that the city should have nothing for its support

and administration except what may remain after discharging its annual contract obligations, the contingency is quite possible, if not imminent, that absolutely nothing may be left for that purpose, and, even then, it may be compelled to exceed the limitation. Such a construction is too absurd for serious consideration.

As was said by the Supreme Court of the United States with regard to our own city: "In a city, even of small extent, the authorities have to provide for the preservation of peace, good order, and health, and the execution of such measures as conduce to the general good of its citizens, such as the opening and repairing of streets, the construction of sidewalks, sewers, and drains, the introduction of water, and the establishment of a fire and police department. In a city like New Orleans, situated on a navigable stream, their powers are usually enlarged so as to embrace the building of wharves and docks or levees for the benefit of commerce. The number and variety of works which may be authorized, having a general regard to the welfare of a city and of its people, are mere matters of legislative discretion. All of them require for their execution considerable expenditures of money. Their authorization, without providing the means for such expenditures, would be an idle and futile proceeding. Their authorization, therefore, implies and carries with it the power to adopt the ordinary means employed by such bodies to raise funds for their execution, unless such funds are otherwise provided. The ordinary means in such cases is taxation. A municipality without the power of taxation would be a body without life, incapable of acting, and serving no useful purpose."

United States *ex rel.* Ranger vs. New Orleans.

All the powers referred to in the foregoing are conferred, in large measure, upon the city of New Orleans by its charter. We are bound to assume that the power of taxation conferred was intended to be employed to the extent necessary in executing those powers; that it is the first duty of the corporation, essential to its very existence, to provide, out of its revenues, for the necessary expenses of its government; that only the excess above these necessary expenses can possibly be devoted to the payment of its anterior debts; and that if this excess is not sufficient to discharge the just demands of antecedent contract creditors, the latter, as against whose rights posterior legislative and even constitutional limitations are without effect, have the right to require, and it is the duty of the city to enforce, additional taxation to a sufficient amount.

In this case it is asserted by the city, and is admitted by the relators, that the whole of the ten-mills tax authorized by the Constitution is required for the necessary expenses of administering the government, and has actually been appropriated to those purposes. If the amount

required for the necessary expenses of the city government were a question submitted to judicial cognizance and determination, we should be disposed, in the interest of the taxpayers, to disregard this admission, and to remand the cause for further and complete evidence to satisfy us of the fact. But it is manifest that this is a legislative, and not a judicial, function. We are not vested with power to frame a budget for the city of New Orleans ; to assume the administration of its affairs ; to constitute ourselves, in effect, the Mayor and Administrators of the city of New Orleans, for the purpose of determining what are, and what are not, proper or desirable municipal functions to be performed, and what are, or are not, reasonable allowances for the performance thereof. These matters are confided by the law to the discretion and control of the corporate authorities. They have actually framed their estimate and budget of revenues and expenditures, and have appropriated the whole of the ten-mills tax to administrative purposes. If these are excessive or extravagant, the remedy lies not with the Judiciary, but with the Legislature. The Legislature has the perfect right to limit the administrative expenditures of the city. That is a subject within the absolute control of legislative power. It has not done so, except within the limit of the ten-mills tax. Holding, first, that the necessary expenses of the city must first be paid out of the proceeds of that tax ; and, second, that the determination of what are necessary expenses is not a judicial function, but a function of the municipal government, we find ourselves unable to give relief against any excessive appropriations, within ten mills, made for that purpose.

Holding that relators and the other holders of Premium Bonds are entitled by virtue of their valid contract with the city to a special tax of five mills, and the city having exercised its legislative function by levying the tax and making the appropriation at the proper time and in the proper manner, the rights of these bondholders are vested and complete, and they are entitled to invoke, as they have done, the remedies of mandamus and injunction, to compel the city officers to proceed in the performance of their ministerial duties in collecting and applying the tax as required by law, and to abstain from action inconsistent therewith.

We wish it distinctly understood that the injunctions and mandamus herein are not to be interpreted as interfering with the power of the city to remodel her budget and tax-ordinances, to reduce her estimate of necessary expenses and the rate of taxation required to meet the same, provided, only, she maintain the appropriation for the Premium Bonds and the special tax of five mills required by the Premium-Bond Act. The mandamus only requires the defendants to include in every tax-bill one half of one per cent, to be applied to Premium

Bonds as required by the law; and to collect the same, and to carry the same to the Premium-Bond account.

The injunctions are confined to apprehended acts of the city in conflict with those duties. In other respects they do not interfere with the power and discretion of the city functionaries.

We have already evinced our determination to enforce the limitation of article 209 of the Constitution as to all rights not protected by the Constitution of the United States. The over-burdened taxpayers may rely upon it as a secure shield against the imposition of excessive taxation for any future indebtedness of the corporation, and, within its limit, against future extravagance of administration. If they can justly claim that the power of the city in fixing the expenses of administration may and should be reduced within further limits, they may look for such restraint to the only power capable of imposing it, the Legislature of the State.

Inexorable necessity, entirely beyond our control, requires them to bear, with patience, the burdens of antecedent contract obligations, relics of evil days, legacies in great part of extravagance and fraud, but now shaped into such forms of contract as to preclude investigation of their origin and consideration, and so protected by the paramount law of the land that neither State Constitutions, State Legislatures, nor State Courts can give relief against them; and all attempts to do so can end in nothing but failure and additional disaster.

It is therefore ordered, adjudged, and decreed that the judgment herein appealed from be affirmed, at costs of appellants, in both courts.

---

### DISSENTING OPINION.

BERMUDEZ, C. J. The following dissenting opinion was delivered by his Honor, Edward Bermudez, Chief Justice:

I cannot concur in the opinion and decree of the majority of the Court in these cases.

As matters of great public interest have been agitated, I have made it my duty to assign the reasons which constrain me to dissent.

The issues presented in this litigation involve many important questions, difficult of solution, as well as matters of magnitude to those concerned.

The questions raised may, however, be unified and assumed to be:

Has this Court the legal right, and is it the duty of the Court, to enforce the act of the General Assembly of the State of Louisiana, approved March 6th, 1876, promulgated as No. 31 of the Statutes of that year, and generally known as the "*Premium-Bond Act?*"

NEW ORLEANS, MAY, 1880. 751

Moore vs. City of New Orleans et al.

I consider that this Court is prohibited from doing so, because of the glaring unconstitutionality of the act, both in substance and in form.

I consider that it is manifestly unconstitutional:

First. Because, it divests vested rights, and impairs the obligations of valid contracts ;

Second. Because, it is contrary to public policy and good morals ;

Third. Because, it is framed in a manner forbidden by the State organic law in force at the time of its adoption ;

Fourth. Because, by enforcing it the rights of parties who have not shown themselves to be creditors are recognized, and the burden of taxation is increased, without a due regard to the provision for relief found in the Constitution now in operation.

An objection was made to the right of the city to plead and urge these defenses.

Let us examine and see to what extent the objection may be sustained :

It is generally laid down that a person can set up in defense to an action upon a contract, that the contract was made in fraud of *others not parties to it*, and that in such instances the Court will lend an attentive ear to such a defense, and afford all possible adequate relief.

The character of such an agreement is not changed by showing that the claim of the third person whose rights were to be affected by it was also fraudulent.

Randall vs. Howard, 2 Black, 585.

Coppell vs. Hall, 7 Wall. 542.

Fay vs. Fay, 121 Mass. R. 561.

Story's Equity, 1, sec. 298.

2 Paige, 156 ; 9 Gill, 356.

The defense is allowed for the vindication of the law itself on a principle which is indispensable to the purity of the administration of justice. So says the highest Court in the nation.

In 1 H. Black, 327, Lord Ellenborough said :

" The law encourages no man to be unfaithful to his promise, but legal obligations are, from their nature, more circumscribed than moral duties."

Now, in 2 Black, 588, the Supreme Court of the United States said :

" It is against the policy of the law to enable either party, in controversies between themselves, to enforce an agreement in fraud of the law, or which was made to injure others."

The maxim " *in pari delicto, melior est conditio defendentis* " must prevail.

*Vide*, also, 4 Ves. 461 (Am. Ed.) Eastabrook vs. Scott.

If an immoral contract be null, the principle " *quod nullum est,*

*nullum producit effectum*" must serve as a guide, and the contract be declared inoperative.

Demolombe, 24 v. 380.

3 A. 318 ; 12 A. 496 ; 30 Miss. 699.

An immoral act cannot be ratified.   The doctrine of *estoppel* applies to acts not wrong in themselves, but only relatively so, or to which, after contest, judicial adjudications have imparted a lawful character.

Coppell vs. Hall, 7 Wall. 542.

20 Wall., 496, 655.

3 A. 308 ; 6 R. 115 ; 12 A. 688 ; 28 A. 343 ; and Dillon, Mun. Corp. 381.

"An understanding between a debtor and one of his creditors, to effect a composition by which a preference is to be given him, renders the whole contract invalid, and the *debtor himself* can set up the illegality."

Bigelow on Fraud, p. 343, and authorities in note.

Where a transaction contravening public policy has taken place, relief may be given, at the suit of one who is "*particeps criminis;*" *relief is given in such cases to the* PUBLIC *through the party.*

Lord Hardwicke once observed :

"The truth is, that in these cases of violation of public policy, *it is indifferent who stands before the court,* if the intention of the contract be evident ; because, the court does not regard the state and condition of the parties so much as the nature of the contract and the public good."

*V.* Gilbert vs. Chudleigh, 9 Ves. 299 ; also, 9 Ves. 292 ; 11 Ves. 535 ; 13 Ves. 587 ; 3 Austr. 914 ; and 1 Story's Equity, sec. 298.

The objection that the city has no authority to raise these defenses, because it assumes thus to champion, without any mandate, the rights of bondholders and of taxpayers, who could not themselves complain, and who, besides, are silent, is not tenable.   The city represents the interest of her creditors as well as that of her corporators and of the public, nay, the State itself, it being a State functionary.   The officers appointed to administer its affairs are commissioned and sworn to represent the public interest and welfare, and they have a standing in court to urge all the defenses which may be hurtful or injurious to those it represents.

See People vs. Bond, 10 Cal. 563.

In the present instance, the objection is the more groundless, because among the defendants are to be found municipal officers who, under the charter of 1852 (sec. 37), and under the charter of 1870 (sec. 17), are the Commissioners of "The Consolidated Debt," and who, in that capacity, are entitled to suggest to the Court matters which may, after all, be noticed *ex officio* by the Court.   *A fortiori,* therefore, can

they be allowed to aver, and to substantiate by proof and argument, such suggestions.

I was surprised at the rapidity with which the proceedings in these cases have been conducted.

If it be true that injured bondholders and complaining taxpayers would have had the right to intervene and to join the city in a litigation which is *summarily* to be tried, and without unnecessary embarrassment, the question may be asked:

How could such interventions have been prepared and presented in a matter which was being hurried through with unprecedented celerity?

If the affected bondholders and taxpayers concerned had no right to intervene in cases prosecuted with such unusual speed, the power of the city of New Orleans to set up the defenses pleaded in these cases for the benefit of all cannot be *consistently* disputed, and *should* be recognized.

Assuming that the city can be heard, I will next proceed to examine the questions of constitutionality, treating together those relating to *substance*, as they are intimately connected and blended; reserving the consideration of the unconstitutionality of the act for defect in *form* as the last point to be dealt with.

Act No. 31 of 1876 is "an Act to adjust, regulate, and provide for the bonded debt of the city of New Orleans."

It sanctioned certain municipal ordinances, projecting a plan designated as "The Premium-Bond Plan." The preamble discloses, as the motive of its enactment, the existence of conditions of disorder, derangement, and weakness in the finances of the city, and the inability of the citizens to pay the taxes assessed upon their property. It refers to the losses sustained in civil war, from extravagance and reckless expenditures, accumulating the public debt. It enumerates disasters from floods and other like causes, as occasioning the depreciation of property. It proclaims the impotency of the city to meet her engagements. It forcibly exhibits bankruptcy as staring in the face.

Act No. 31 was designed, if not to remove, at least to palliate, both the actual and the apprehended evils. The municipal authorities were commissioned to ascertain the principal and interest of the valid bonded debt, and, after the accomplishment of that task, to *novate* the ascertained debt, by the delivery of bonds of a character previously unknown in this country, and termed "Premium Bonds." They were to be accepted in exchange for the outstanding bonds of the city, dollar for dollar.

These bonds were to bear interest at five per cent, and to be payable at *no fixed time*, but merely at dates to be determined by the happening of certain contingent events. All this was to take place under

the plan established by the city ordinances to which a *general* reference is made in the statute.

Under this plan, money was to be collected by means of a *special* tax, which was to be applied *exclusively* to the Premium Bonds, at stated periods, by distribution, by lot or chance, among the bondholders. The fortunate bearer of the bond drawn by the allotment was to be paid in full, while others, less lucky, were to await their turn, without, in the meantime, receiving any accrued interest. The sum of one hundred thousand dollars ($100,000) was also to be collected to pay a debt in the shape of *premiums,* or prizes, and not in part extinguishment of the funded debt. It was contemplated that under the operation of this projected scheme fifty years would· suffice to extinguish the entire municipal debt. The consent of the outstanding bondholders was not at all considered and regarded as a pre-requisite for the undertaking. In their ordinances the City Administrators suggested, and, in their sanctioning act, the General Assembly relied upon, the *coercive* feature and influence of the seventh section of that act to accomplish the object in view. The seventh section reads as follows :

*Extract from Act No. 31, approved March 6th, 1876, known as the Premium-Bond Act.*

"Sec. 7. Be it further enacted, etc., That no tax for the payment of Bonds or interest on Bonds other than that authorized by the preceding sections, shall be levied either for the year 1876 or any year or years thereafter by the City of New Orleans, and that all existing laws requiring or authorizing the City Council to levy any tax whatsoever for bonds or interest on bonds other than said Premium Bonds be and the same are hereby repealed, and it shall be hereafter incompetent for any Court to mandamus the officers of said City to levy and collect any interest-tax other than that provided for in this act, or in case of such mandamus by a receiver or otherwise to direct the levy and collection of any such tax."

It unmistakably contains a *repeal* of all laws which prescribed or authorized the levy of taxes to pay *anterior* bonds or interest on the same, and was intended to exclude from participation in taxes to be collected in future all bonds other than Premium Bonds. It *forbade* the levy of taxes in future to pay principal and interest on the then existing bonded city debt. It *provided* for a special tax to meet the payment of those Premium Bonds with interest, and formally proclaimed that by contract no assessment of taxes would be made for the payment of the principal and interest of any other bonds. A clause in that section went to the unprecedented and scandalous extremity of paralyzing the courts of the country, by disabling them from affording adequate aid and relief to the municipal creditors. Ostensibly, with all the solemnity

of a legislative enactment, that section proclaimed and legalized, as far as it was in language possible to do, a REPUDIATION of part of the legal municipal debt ! It is evident that the corporation could not have expected any bondholder to *novate* his bonds by an exchange for a Premium Bond, unless an effective means of coercion was adopted. It is, indeed, owing *only* to this provision that the public money in the municipal treasury could actually be diverted from its legitimate purposes and appropriated to a class of favored obligations, in consideration of partial abatements of interest.

The sixth section of the Act is to the same effect as the seventh. The latter portion of it reads as follows :

" The said tax to be raised shall be denominated the Premium-Bond Tax, and shall be separately mentioned in the tax-rolls and receipts ; provided, that the taxable power of the corporation of the city of New Orleans for all purposes, including general administration, school, police, lighting, salary of officers, court expenses, and every other purpose of government, including the sum to be raised to pay the Premium Bonds, as above stated, shall never, until the full, complete, and final payment of the said Premium Bonds, exceed the rate of one and one half per centum on the dollar of all the assessed value of property subject to taxation within the limits of the said city of New Orleans. The above limitation on the taxable power of the corporation is hereby declared to be a contract, not only with the holder of the said Premium Bonds, but also with all residents and taxpayers of the said city, so as to authorize any holder of said Premium Bonds, resident or taxpayer, to legally object to any rate of taxation in excess of the rate herein limited. It being also a part of the consideration of this contract that the city of New Orleans shall be incompetent to incur any debt or obligation, as now provided by the Constitution of this State, until the final payment and extinction of the Premium Bonds aforesaid."

The fifteenth section of the enactment, which is really the last, as that which follows, solely proposes to repeal conflicting laws and ordinances, reads as follows :

SEC. 15. " Be it further enacted, etc., that this Act, in all its provisions and limitations, be held a contract between the city of New Orleans, the holders of said Premium Bonds, and the taxpayers or residents of said city, so as to authorize any of the contracting parties to resist any and all contracting of debt by the said city, or increase of taxation above the rate limited in the previous provisions of this act."

It must strike every disinterested mind that by this section it was unquestionably intended that the Act would be, " in all its provisions and limitations," *an indivisible and entire contract* between the State, the City, the bondholders, and the taxpayers.

In other litigations. the seventh section was invoked as a bar to the suit of certain bondholders, asking relief against its provisions, and it cannot be said that practically it did not prove to be a valid enactment. In the present controversy, no one was bold enough to uphold its constitutionality. In truth, however extreme were the circumstances under which this Act was enacted, it must be acknowledged that it is an unprecedented and avowed desecration and trampling under foot of the inviolable safeguards with which the wise framers of the National Constitution have surrounded vested rights, by prohibiting States, in the exercise of any of their powers, in any of the branches of the government, from impairing the obligations of contracts.

It is contended, that, conceding the unconstitutionality of section seventh, it does not follow that the whole act is open to the same objection ; what would remain of it can well stand by itself, and may be executed as valid legislation. The legal proposition contained in the argument is elementary ; the question really arises, whether the remaining portions of the act assailed in the present instance *can* stand by themselves and be executed.

The object of the act was, *per fas aut nefas*, the exchange of municipal bonds. Necessarily, provision had to be made for some distribution of money among the holders of the new bonds ; and no such money could be realized, *unless* by taxation, and once realized, could prove available, except if exclusively raised for the benefit of the new bonds and divided among their holders, under the arrangement agreed upon. This could not be done, without depriving of their rights other creditors of the city who were not willing to enter into the scheme. Such a result could not be successfully obtained without legislation to that end. It is expressed, as fully as possible, in article six, which provides that the taxable power of the city, for all the purposes of government (including the general administration of its affairs), the sum to be raised in order to effect the payment of the Premium Bonds, *shall never* exceed *one and one half* per cent on the dollar of the assessed value of property. This limitation to the taxable power of the corporation is declared to be a *contract* not only with the bondholder, but also with all the residents and taxpayers of this large metropolis. The city was, accordingly, to be powerless in incurring any debt or obligation, as now provided by the present State Constitution, until the final payment and extinction of the Premium Bonds.

Section six and section seven have the same object, the same purpose. They were inspired by the same motives, and are open to the same objections. Every obnoxious provision found in section seven is incorporated in section six.

If, consequently, section seven be stricken out as unconstitutional,

section six must be treated in the same manner and for the same reason. It must be remembered that section six provides for the levy of the tax wherewith to carry out the provisions of the Act by the payment in capital and interest of the drawn Premium Bonds. It is this section which is the soul of the Act; if it cease to form part of it, the unavoidable consequence is, that there remains, in the Act, no provision authorizing the levy of a tax to pay the singular class of obligations thus issued, which, if they are to be considered as valid, would have to remain unsatisfied, at least until the Legislature would be pleased to provide for their payment. Two sections of such importance and magnitude, which were to be like the lungs through which the Act was to breathe for life, being considered as unwritten, the necessary result would be that the dismembered and mutilated Act would fall of itself as though stillborn and lifeless. These sections were, therefore, essential for the execution of the *projet* or plan in contemplation. No one holding municipal obligations maturing at fixed dates, bearing a larger rate of interest, and secured by special laws for the levy, collection, and application of taxes, would ever have exchanged the same against obligations of an unusual form, with no positive date of maturity, bearing a lower rate of interest, no part of which was payable before the bond was drawn *by lot*, and for the payment of which no provision for the levy of a tax was made.

The denial of this proposition would not only not be plausible, but would carry on its face its own refutation and destruction.

Under section 15, "all the provisions and limitations" of the act are grouped together, for the purpose of stating the terms of the contract, and, therefore, form a unit and constitute one indivisible obligation.

See Morgan vs. Second Mun. 1 A. 116.

Mouton vs. Noble, 1 A. 192.

Also, 35 New Jersey, 621.

7 Cal. 759 ; 10 Cal. 593.

10 Cal. 563 ; 19 Wis. 468.

It is a principle irrevocably implanted in the heart of man and of nations, and universally admitted, wherever law and justice are recognized and prevail, that an insolvent or a defaulting debtor cannot legitimately assign his property, so as to confer a priority or preference (like that granted in the act under consideration to the Premium-Bond holders) to a privileged class of individuals, to the prejudice of other creditors who are unwilling to accept obnoxious terms and conditions proposed. All such arrangements have, necessarily, to be disregarded and denounced as actual or as constructive frauds by courts of justice in the discharge of their stern and sacred duties.

49

What principle is better established and consecrated than that which declares that individuals cannot by their own conventions derogate from the rules sanctioned and recognized by long-existing usage, custom, and law for the preservation of public order and good morals? Also, that in all cases in which a thing is not expressly or impliedly prohibited, men can renounce what may be established *in their favor* when the renunciation does not affect the rights of others, and is not repugnant to the public welfare.

" *Pacta, quæ contra leges constitutionesque vel contra bonos mores fiunt, nullam vim habere, indubitati juris est et privatorum conventio juri publico non derogat.*"

Broom's Legal Maxims, p. 621.

Now, can a Legislature, which is the representative of the conscience of the people, whose integrity and honesty of purpose, and whose submission to the paramount authority of obligations must be assumed by the courts of the country, arrogate to itself the power of enabling a debtor to divest vested rights, to practice a fraud upon his creditor, or to exclude such a creditor from participating, in payment of his claim, in the proceeds of his (the debtor's) property, unless, first, he consent to an alternative in the form of a contract repugnant to the fundamental law, to public policy, and to public morality? It was to guard against such an abuse of power that the Federal Constitution has wisely restrained States from performing acts which would impair the obligation of valid contracts, and also that State Constitutions have likewise forbidden the divestiture of vested rights. So was it said in the case of Murray vs. Charleston, reported in 96 United States, 449. The language there used is as follows:

"The inviolability of contracts, and the duty of performing them as made, are the foundations of all well-ordered societies, and to prevent the removal or disturbances of those foundations, was one of the great objects for which the Constitution was framed."

The provision of inviolability applies not only to creditors, but to debtors also. A valid compact, once made, cannot be undone without the consent of all the parties who entered into it, in the mode prescribed by law for its modification or destruction by judicial interference, or in cases provided for by law and equity. The constitutional clause was never intended to shield contracts from impairment by State authority which are formed *in violation* of public policy or good morals. The United States Supreme Court has uniformly refused to review State adjudications based upon that ground solely.

Any legislation by the law-making power which is violative of the organic law, which is paramount to it, is necessarily immoral, void, and

inoperative. Such enactments must remain a dead letter upon the statute-book, and are not susceptible of enforcement on the part of an impartial and independent judicial tribunal. Courts are without power to declare an act immoral or contrary to public policy, as long as there exists no conflict between it and the organic fundamental law. Laws which contemplate or attempt to divest vested rights are essentially immoral, and must be treated and declared as null, void, and of no effect. In different and more forcible language, can a Legislature authorize a debtor to say to his creditors : "I have property ; I can pay you in fifty years ; I offer to pay *a portion of you* every year ; creditors to be paid, to be selected by lot ; those who refuse to accept my terms will not be paid at all." If such an understanding between debtor and creditor were incorporated in an assignment made for the benefit of creditors, no court will be found to sustain and enforce it on its very face, *even between the parties.*

The authorities denounce, without mercy, such a transaction as a fraudulent attempt to hinder and delay creditors.

*Vide,* 4 Ala. (N. S.) 374.

11 Wend. 201 ; 6 New York, 517.

10 N. Y. 593 ; 7 A. 270 ; 13 L. 457 ; 62 Barbour, 395 ; 10 Cal. 563 ; 12 Bush. K. 110 ; N. J. L. R. 110 ; 2 Cal. 52 ; 4 Am. L. Times, 226 ; 38 N. J. R. 110.

The least impairment of the rights secured by the contract, either as to the substance or as to the means of enforcement, by a postponement of the time of payment, a change of the mode of settlement of the quantum of money to be paid, or by a resort, as a substitute, to some unusual, whimsical, or previously unheard-of settlement and method of payment by allotment, could not be maintained, unless unanimously concurred in by the creditors.

*Vide,* 1 P. C. C. 410 ;

1 Binney, 110 ;

4 Yates, 34 and 84 ;

1 Com. Pleas Div. 265 ; 1 *Q. B.* Div. 679 ;

Law R. Q. B. 491 ; 96 W. S. 184.

Act No. 31 was adopted to adjust, regulate, and provide for twenty-three millions of dollars ($23,000,000) of the bonded debt of the city. There had been pledges in favor of large portions of that debt, which were, in some instances, coeval with the issue of the bonds, and were designed to accredit them.

For a long period it had been the organic law of the land that courts were to be and remain open for the vindication of rights and the redress of wrongs, both public and private, by speedy justice and adequate process, which were accorded to all ; that vested rights were not

to be wrested away; that the obligations of contracts were not to be altered or impaired by any branch of State Governments. There had been enacted a Code of Laws, derived from the most ancient and modern fountains of recognized justice and authority, regulating civil order and proclaiming the admitted and indisputable principles established and enforced in the civilized world for the well-being of social, municipal, and domestic intercourse. Those codes embody the rules under which conventional obligations arise and are executed, and under which the contracting parties can be coerced to a strict performance of their duties; the means, also, by which those obligations can be extinguished are set forth. One of the rules has always forbidden a defaulting or insolvent debtor to grant a preference to one creditor over another. His property is considered the common pledge of all his creditors, who are to share in its proceeds, and, then, only in the manner and with the rank provided for by law. The debtor and creditor were permitted to indulge in no fraudulent or deceitful practices to hinder, delay, or defraud other creditors.

Individuals and corporations stand on the same footing. A common duty, to be honest and pay legal debts, within the bounds of their respective ability, exists and binds *both* alike. A bargain by which a municipal corporation agreed to divert public funds in the distribution of which all its creditors are entitled to participate away from one class of creditors, and apply them to a privileged class of creditors, has been justly deemed fraudulent, and, consequently, pronounced to be null, void, and of no effect. The Mobile case, 4 Am. Law Times, 226, is to that effect. See, also, Craig vs. Missouri, 4 Pet. 436; 1 Binney, 110: 4 Yates, 34 and 84.

The most elevated tribunal of the nation, the sole expounder in last resort of the true principles of the Federal Constitution, and to which all legislation must yield, has gone to the extent (and most properly, too,) of applying the inhibition relating to the impairing of obligations and contracts even to the judiciary of the States, so as effectually to prevent it by unauthorized adjudications from attempting to alter or impair, in the least degree, obligations and contracts validly formed.

An analysis of Act 31, and of the practice under it, conclusively shows that the intent and purpose of its framers was to hinder, delay, and obstruct the operation of pre-existing laws relative to the anterior bonded debt of the city of New Orleans. By the terms of the Act itself, a large number of statutes are formally repealed *in block*, for the evident purpose of hampering successfully the existing creditors entitled to rights under the repealed legislation, but who were unwilling to submit to the scheme, and of impeding them in the assertion and vindication of their well-founded pretensions, and thus of coercing them to yield and

submit to the high-handed measure. The powers of the judicial tribunals of the State were, so, expressly curtailed by the Act and shackled for that very object.

·II.

It is next argued and urged that the Act is unconstitutional in point of form, because it violates Article 116 of the Constitution of 1868, in force at its passage. That article declares, that the General Assembly shall *never* adopt any system or code of laws by *general* reference to such system or code of laws, but in all cases shall specify the several provisions it may enact.

The test under this article of the constitutionality of an Act is, whether the act attacked would be operative without reference to the act or acts alluded to ?

In Walker vs. Caldwell, 4 Annual, 298, the Court held :

"The Act of 1848 purports expressly to amend the Act of 1847 by reference to its title, and *without reference to the act of 1847* its provisions would be inoperative. It purports to do that which the Constitution declares shall not be done, and the act must yield to the operation of the Constitution, or the articles of that instrument providing for the forms of legislation shall be declared to be of no effect. These forms have been placed, under the guarantee of the Constitution, as a safeguard against errors or abuses by the legislative power."

The concurring opinion of Chief Justice Eustis (who was not the organ of the Court) in the matter of the Succession of Franklin, 7 An. 407, does not and could not pretend to establish a contrary doctrine.

The title of the Act is expressive of seven distinct objects, one of which is to authorize the exchange of bonds of the city according to a plan known as " The Premium-Bond Plan ;" another to adopt and give legislative sanction to said plan, as set out in Ordinances 3130 and 3233, Administration Series, of the city of New Orleans, approved May 25th and August 31st, 1875.

The first section of the act authorizes the Mayor and Administrators to exchange the bonds " *in accordance with the plan adopted by the City Council of New Orleans, and approved by the Mayor on the twenty-fifth of May and thirty-first of August, 1875.*"

What *that* plan is does not at all appear, not even *substantially*, from the body of the act. For the understanding and execution of the act, the object of which was, after all, but an *exchange* of old for new bonds, it is absolutely necessary to consult the ordinances to which express reference is made in the act. No one can know what they are *from the face* of the act. The official journal of the city, the archives of the City Hall, are to be searched as the only guides for a knowledge of the

act. In point of fact, after a serious examination and close scrutiny, they furnish no satisfactory data to the enquirer.

It is established that an act which *refers* to another act, without specifying its provisions, and which is inoperative without such reference, is unconstitutional. If the Legislature is prohibited from vivifying acts by reference—acts found in the statute-books of easy access, which the public, and every one, was bound to know—how can it be for a moment pretended that such a reference is to be tolerated, sanctioned, and upheld, when it has for its object municipal ordinances which no one, surely none out of the municipal territory of the city of New Orleans, is bound to know, and which all have a right to ignore.

Constitution of 1868, art. 116 ; 4 An. 297 ; 10 An. 721 ; 11 An. 56.

A citizen residing in any parish, that of Orleans excepted, could not understand the act without coming to New Orleans and inspecting the archives at the City Hall.

Can it be asserted with any degree of plausibility that the intention of the framers of the Constitution ever was to sanction such a mode of legislation? The proposition is too clear to require any further elucidation.

I conclude that the act in question cannot be enforced in favor of the holders of the bonds issued under it, as is proposed by the plaintiffs in these cases ; but I do not express any opinion upon what their rights might be if they were remitted to the original evidences of indebtedness given in exchange of the obligations now held and exhibited by them.

This view of the case would have dispensed with an examination of the question of the validity and effect of article 209 of the present (1879) Constitution, which provides that *no municipal tax shall exceed ten mills* on the dollar of assessment. While on this subject, however, I may observe that the motives and considerations which have induced the Convention to place such a wholesome restraint on the power of municipal taxation need not be told, and much less enumerated, to a tax-ridden people. I purposely omit to express any opinion in regard to the applicability claimed for that article to the cases before the Court.

Nor am I to be understood as expressing any opinion as to the validity of the bonds issued prior to 1876, and not herein assailed, on the ground that the consent or authority of the people was not previously obtained, and provision for payment was not made, as required by section 37 of Act No. 71 of 1852 (then the city charter).

It will be time enough to consider the question when the same shall, if ever, be presented to this Court for determination. I conclude merely, that the act which confers exclusive right of taxation for the purpose of providing means for the allotments described is one that this Court cannot legally enforce, because in contravention of the

rights and interests of creditors protected by the Constitution of the State; further, because it tends to hinder, delay, and obstruct them in depriving them of their just rights, rights vested in them under the organic law; and, because it is violative of public order and policy under the Constitution and laws of the State; and, also, because it is not framed according to the forms prescribed by law under pain of nullity, and directed by the Constitution in force in the year 1876.

My intention in expressing views different from those of the majority of the Court is to be tested only by a proper appreciation and sense of official duty.

Mr. Justice Poché concurs in this opinion.